# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

========================

## ON REHEARING

========================

## NO. 03-08-00473-CV

Appellant, Employees Retirement System of Texas// Cross-Appellant, The Putnam
Advisory Company, LLC

**v.**

Appellees, Putnam, LLC, d/b/a Putnam Investments; Putnam Investment Management,
LLC; and The Putnam Advisory Company, LLC// Cross-Appellee, Employees Retirement
System of Texas

---

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 200TH JUDICIAL DISTRICT
NO. D-1-GN-05-003755, HONORABLE MARGARET A. COOPER, JUDGE PRESIDING**

---

## O P I N I O N

We withdraw our opinion dated July 15, 2009, and substitute the following in its

place. The Employees Retirement System of Texas ("ERS") brought suit against appellees Putnam,

LLC, d/b/a Putnam Investments; Putnam Investment Management, LLC ("PIM"); and Putnam

Advisory Company, LLC ("PAC") for fraud, fraudulent inducement, breach of contract, negligent

misrepresentation, and tortious interference with prospective business relations.[1] The trial court

disposed of ERS's claims by granting a series of summary-judgment motions, ultimately ruling that

---

[1] We will refer to the appellees collectively as "Putnam," except when necessary to
distinguish among the three Putnam entities. We note that the breach-of-contract claim was brought
solely against PAC.

ERS take nothing on all of its causes of action. PAC filed a counterclaim for breach of contract and the trial court granted ERS's plea to the jurisdiction on the basis of sovereign immunity.[2]

In three issues on appeal, ERS argues that the trial court erred in granting summary judgment on (1) ERS's tort claims, (2) ERS's lost business opportunity damages, and (3) ERS's claim for breach of contract. PAC cross-appeals, asserting that the trial court erred in granting ERS's plea to the jurisdiction in connection with PAC's counterclaim. We affirm the trial court's judgment in its entirety.

## BACKGROUND

ERS is the public pension and benefit fund for Texas state employees. Section 815.301(c) of the government code authorizes ERS to "contract with private professional investment managers to assist the board in investing the assets of the retirement system." Tex. Gov't Code Ann. § 815.301(c) (West 2004). In 2001, ERS invited a number of investment firms, including Putnam, to submit bids to become ERS's new advisor with respect to international investment funds. As part of the procurement process, the invited firms were required to respond to a questionnaire that inquired, among other things, whether the firm was "currently out of compliance with the SEC, DOL, or any other regulatory agency." ERS hired RCM Dresdner as its international portfolio advisor in the 2001 procurement, but decided to replace Dresdner in the third quarter of 2002. Based on the proposals submitted in 2001, ERS selected Putnam, Templeton/FTI Institutional

---

[2] We hereby grant the parties' respective motions for leave to file post-submission briefs and overrule Putnam's motion to preclude ERS's reliance on certain evidence. The exhibits at issue in Putnam's motion to preclude were incorporated by reference into ERS's response to Putnam's final motion for summary judgment and were therefore properly included in the trial court's record.

("Templeton"), and DuPont Capital Management Corporation ("DuPont") to make formal presentations to ERS's board and investment advisory committee.

After hearing the presentations of the three finalists, the board voted to divide advisory responsibility for ERS's international portfolio by allocating responsibility for 40% of the portfolio to Putnam, 40% to Templeton, and 20% to DuPont. As a result, in December 2002, ERS entered into a three-year investment advisory contract with PAC, a Putnam, LLC subsidiary that provides investment advisory services to institutional clients concerning non-mutual-fund investments. The contract specifically required PAC to maintain compliance with all regulatory agencies, to notify ERS immediately if any representations made in soliciting the contract were "no longer true and correct," and to notify ERS of any violations or investigations into violations by any regulatory agency that might have a material adverse effect on PAC's ability to perform its duties or obligations under the contract.

Under the contract, PAC advised 40% of ERS's international equities portfolio, or approximately $700 million. The relationship between ERS and PAC was strictly advisory, meaning that PAC provided trade recommendations to ERS, but ERS held the assets and securities, executed the trades itself, and was free to accept or reject PAC's advice. From January 2003 until the contract was terminated in November 2003, ERS executed all of PAC's recommended trades. ERS did not contract with any other Putnam entity or hold shares in any Putnam mutual funds.

In October 2003, the Securities and Exchange Commission ("the SEC") and the Commonwealth of Massachusetts, through the Massachusetts Security Division ("the MSD"), filed complaints against PIM, a Putnam, LLC subsidiary, concerning alleged "market timing" activities in Putnam mutual funds. Specifically, these complaints alleged that between 1998 and 2003, Putnam

3

portfolio managers Justin Scott and Omid Kamshad had engaged in short-term trading in Putnam mutual funds over which they had investment responsibility and access to nonpublic information, gaining personal profit at the expense of the funds and shareholders. The complaints further alleged that Putnam had been aware of this improper trading activity since early 2000, but had failed to disclose it to the funds' shareholders or take adequate steps to detect and deter such activity through its own internal controls and supervision. Scott and Kamshad were employees of both PAC and PIM and were members of the team in charge of the ERS business relationship. However, ERS concedes that because it had not invested in any Putnam mutual funds, any market timing activity in those funds could have no financial impact on ERS's portfolio.

While the parties agree that "market timing" is not illegal per se, the practice, often described as excessive short-term trading, can constitute a breach of a portfolio manager's fiduciary duty to shareholders and is discouraged in the industry. According to the SEC's final order in the regulatory investigation of PIM:

> Short-term trading of mutual fund shares can adversely affect mutual fund shareholders because, among other things, it can dilute the value of their shares, raise transaction costs for the fund, disrupt a fund's stated portfolio management strategy, require a fund to maintain an elevated cash position, and result in lost opportunity costs and forced liquidations. Short-term trading can also result in unwanted taxable capital gains for fund shareholders and reduce the fund's long-term performance. Consequently, mutual fund managers such as Putnam, among other things, often maintain policies and procedures to detect and prevent short-term trading.

See also Securities & Exch. Comm'n v. Gann, 565 F.3d 932, 934-35 (5th Cir. 2009) ("Market timing is not illegal, but many mutual fund companies prohibit this type of trading of shares of their funds. . . . Fund companies object that market timers' gains come at the expense of long-term

4

investors and increase transaction costs, so such companies employ a number of strategies to discover and impede traders engaging in the practice."). The parties strongly dispute the extent to which market timing in mutual funds was perceived by investment firms to be a violation of SEC regulations prior to the fall of 2003.

On November 12, 2003, after learning of the SEC and MSD investigations, ERS terminated its relationship with Putnam and transitioned the approximately $700 million in funds that had been advised by Putnam into the DuPont- and Templeton-advised portfolios. The next day, PIM entered into a consent order pursuant to an offer of settlement with the SEC. The consent order included a final censure, a cease-and-desist order, and the imposition of fines and restitution.[3]

ERS then filed suit against Putnam, bringing claims of fraud and fraudulent inducement, breach of contract, negligent misrepresentation, tortious interference with business relations, and breach of fiduciary duty.[4] ERS's tort claims were based on three alleged misrepresentations or nondisclosures by Putnam. First, ERS claimed that in responding to the 2001 procurement questionnaire, Putnam knowingly provided a false answer by responding, "No," when asked whether the firm was "currently out of compliance with the SEC, DOL, or any other regulatory agency." According to ERS, Putnam was out of compliance with the SEC at that time due to Kamshad and Scott's market timing activity. Second, ERS contends that Putnam, while competing to become ERS's investment advisor, made presentations to the ERS board in which it falsely claimed to have a "60 year tradition of integrity." Again, ERS asserts that these statements were

---

[3] PIM entered into a consent order with the MSD on April 8, 2004, which included a cease-and-desist order and the imposition of both restitution and a $50 million administrative fine.

[4] ERS nonsuited other claims, including a claim for violations of Texas securities law.

false in light of the market timing practices at issue in the SEC and MSD investigations. Third, ERS claims that Putnam created a false impression during the procurement process by identifying Kamshad, a key member of the team that would be advising the ERS portfolio, as a chartered financial analyst ("CFA"). While it is undisputed that Kamshad was designated as a CFA at all relevant times, ERS asserts that Kamshad maintained this designation only by falsely certifying that he had abided and would abide by the CFA code of ethics and professional conduct. As a result, according to ERS, Putnam's "touting" of Kamshad's CFA designation conveyed the false impression that Kamshad had and would abide by the applicable code of ethics and professional conduct.

ERS presented two main theories of damages. First, it sought lost business opportunity damages, asserting that Putnam's alleged misrepresentations induced ERS to allocate advisory responsibility for 40% of its international portfolio with Putnam instead of Templeton and DuPont. According to ERS, in the absence of Putnam's misrepresentations, it would have allocated those funds to DuPont and Templeton and earned an additional $75 million during the relevant time period.[5] Under a second theory of damages, ERS sought to recover the cost of rapidly transitioning the Putnam-advised funds into securities recommended by Templeton and DuPont, an amount of $8.6 million.

Putnam filed a series of summary-judgment motions covering all of ERS's claims. The trial court granted each of these motions, ultimately rendering a final judgment that ERS take nothing on all claims. For purposes of this appeal, the relevant summary-judgment motions filed by

---

[5] During the ten months that ERS relied on Putnam's investment advice, the Putnam-advised portion of ERS's portfolio increased in value by approximately 11.4%, representing a net gain of around $80 million for ERS.

Putnam are (1) a motion arguing that ERS's tort claims fail because there was no evidence of any actionable misrepresentation, (2) a motion asserting that ERS is not entitled to lost business opportunity damages as a matter of law, and (3) a motion on the issue of ERS's claim for breach of contract.[6] PAC also filed a counterclaim against ERS for breach of contract. The trial court initially granted summary judgment in favor of PAC on its counterclaim, but later modified the judgment to dismiss the counterclaim on sovereign-immunity grounds.

ERS appeals, asserting that the trial court erred in granting summary judgment on its tort claims, on the issue of lost business opportunity damages, and on its breach-of-contract claim. PAC cross-appeals, arguing that the trial court erred in dismissing its counterclaim on the basis of sovereign immunity.

## STANDARD OF REVIEW

Summary judgments are reviewed de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). To prevail on a motion for summary judgment, the movant must show that there is no issue of material fact and that it is entitled to judgment as a matter of law. *TX Far West, Ltd. v. Texas Invs. Mgmt., Inc.*, 127 S.W.3d 295, 301 (Tex. App.—Austin 2004, no pet.). Evidence favorable to the non-movant is taken as true and every reasonable inference must be indulged in favor of the non-movant and any doubts resolved in its favor. *Id.*

A no-evidence motion for summary judgment must be granted if the moving party asserts that there is no evidence of one or more essential elements of a claim or defense on which

---

[6] The trial court also granted a no-evidence motion for summary judgment on ERS's claim for breach of fiduciary duty. ERS does not challenge this ruling on appeal.

the non-movant would have the burden of proof at trial, and the nonmovant fails to produce more than a scintilla of summary-judgment evidence raising a genuine issue of material fact on those elements. Tex. R. Civ. P. 166a(i); *Cox Tex. Newspapers, L.P. v. Penick*, 219 S.W.3d 425, 432-33 (Tex. App.—Austin 2007, pet. denied).

Sovereign immunity from suit defeats a trial court's subject-matter jurisdiction. *State v. Gonzalez*, 82 S.W.3d 322, 327 (Tex. 2002). Whether a trial court has subject-matter jurisdiction is a legal question that we review de novo. *Id.*

## DISCUSSION

*Lost Business Opportunity Damages*

For convenience, we will begin by addressing ERS's second point of error, in which ERS challenges the trial court's grant of partial summary judgment on the issue of lost business opportunity damages. ERS contends that because Putnam fraudulently induced ERS to hire PAC as an advisor for 40% of the portfolio, ERS suffered lost business opportunity damages in the amount of $75 million, the difference between the amount earned by ERS's Putnam-advised portfolio and the amount those funds allegedly would have earned if advised by Templeton and DuPont instead. In support of this contention, ERS claims that it would have allocated advisory responsibility for all of its international portfolio to Templeton and DuPont if it had known "the truth about Putnam." In its motion for summary judgment, Putnam argued that ERS's lost business opportunity damages are not recoverable as a matter of law because ERS cannot show or produce evidence of proximate cause.

8

Proximate cause is an essential element of every tort claim through which ERS sought to recover its lost business opportunity damages. *See Larsen v. Carlene Langford & Assocs.*, 41 S.W.3d 245, 250 (Tex. App.—Waco 2001, pet. denied) (proximate cause is element of claim for negligent misrepresentation); *Lesikar v. Rappeport*, 33 S.W.3d 282, 305 (Tex. App.—Texarkana 2000, pet. denied) (showing of proximate cause is required to recover consequential damages in fraud claim); *Gonzalez v. Gutierrez*, 694 S.W.2d 384, 390 (Tex. App.—San Antonio 1985, no writ) ("In an action for interference with the business relations of another, the plaintiff may recover such damages sustained by him as are a natural and proximate consequence of the interference.").

The components of proximate cause are (1) cause-in-fact and (2) foreseeability. *See Columbia Med. Ctr. v. Hogue*, 271 S.W.3d 238, 246 (Tex. 2008). "These elements cannot be satisfied by mere conjecture, guess, or speculation." *IHS Cedars Treatment Ctr. v. Mason*, 143 S.W.3d 794, 798-99 (Tex. 2004). Cause-in-fact exists if the defendant's act or omission was "a substantial factor in bringing about the injuries, and without it, the harm would not have occurred." *Id.* at 799. Cause-in-fact is not established if the defendant's actions did nothing more than furnish a condition that made the injury possible. *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex. 1995). ERS's lost business opportunity measure of damages lacks the cause-in-fact component of proximate cause.[7]

_____

[7] In its motion for summary judgment on lost business opportunity damages, Putnam assumed that ERS sought such damages solely through its tort claims because, according to Putnam, ERS "cannot logically seek this measure through its breach of contract claim." In its response to the motion, ERS clarified that it did seek to recover lost business opportunity damages through its breach-of-contract claim. In light of our conclusion that ERS cannot establish the cause-in-fact component of proximate cause, we hold that ERS also fails to satisfy the causation standard applicable to consequential damages in a breach-of-contract claim, where such damages "must be foreseeable and directly traceable to the wrongful act and result from it." *Stuart v. Bayless*, 964 S.W.2d 920, 921 (Tex. 1998).

According to ERS, Putnam's misrepresentations led ERS to place advisory responsibility for 40% of its international portfolio with Putnam, rather than Templeton and DuPont. Even assuming that ERS would have in fact hired only Templeton and DuPont to advise its entire portfolio if not for Putnam's misrepresentations,[8] there is no evidence that Putnam's conduct was a substantial factor in creating the difference in market performance between the funds advised by Putnam and the hypothetical returns those funds would have earned if they had been advised by Templeton and DuPont during the same time period. Rather, Putnam's alleged misrepresentations, at most, did nothing more than furnish a condition that made the injury possible. *See Boys Clubs*, 907 S.W.2d at 477 (stating that conduct does not satisfy cause-in-fact component of proximate cause if it merely furnishes condition that makes injury possible).

As ERS concedes, Putnam's alleged misrepresentations and mutual fund market timing activity had no financial effect on ERS's portfolio. ERS argues instead that Putnam, through its misrepresentations, induced ERS to hire it as an advisor, thus creating lost business opportunity damages in the amount of $75 million—the difference in the performance of the Putnam-advised funds and the returns that these funds would have earned if they had been advised by Templeton and DuPont. ERS characterizes its situation at the time of the alleged misrepresentations as being presented with two distinct paths—it could either place the entire mandate with Templeton and DuPont or split it three ways, as it ultimately chose to do, giving 40% to Putnam. ERS argues that Putnam's tortious conduct caused it to take the path that it did and therefore caused the lost business opportunity damages that resulted from that choice. However, the problem with ERS's position is

---

[8] Summary-judgment evidence indicates that some of ERS's other investment advisors were discovered to have engaged in market timing practices without disclosing the activity to ERS, but that PAC was the only advisor to have its relationship with ERS terminated on this basis.

that, while Putnam's alleged misrepresentation may have led ERS to choose the path that it did, the actual injury complained of—the difference in the performance of the Putnam-advised portfolio and the hypothetical investment returns of the path not chosen—was caused, not by any misrepresentation by Putnam, but by the risks inherent in the securities market. ERS may, with the benefit of hindsight, regret its investment decisions, but the law does not allow an investor to use tort claims as a vehicle to insure itself against market risks.

The Texas Supreme Court has held that damages are not recoverable if they "were simply part of the risk" associated with an investment. *See Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 817 (Tex. 1997). Emphasizing the need for a causal link between the alleged tortious conduct and the damages sought, the court stated:

> Without this limitation, an investor could shift the entire risk of an investment to a defendant who made a misrepresentation, even if the loss were unrelated to the misrepresentation. The basis of a misrepresentation claim is that the defendant's false statement induced the plaintiff to assume a risk he would not have taken had the truth been known. But to allow the plaintiff to transfer the entire risk of loss associated with his investment, even risks that the plaintiff accepted knowingly or losses that occurred through no fault of the defendant, would unfairly transform the defendant into an insurer of the plaintiff[']s entire investment.

*Id.*[9] The supreme court then remanded for a new trial, observing that there was some evidence that the defendant's actions had been a producing cause of the plaintiff's damages. In the present case, however, the damages sought by ERS represent a classic case of losses that "were simply part of the risk" associated with the investment. *Id.* Even in the absence of any allegations of market timing

---

[9] While the court in *Arthur Andersen* applied the "producing cause" standard applicable to claims under the Deceptive Trade Practices Act, rather than the proximate cause standard applicable here, cause-in-fact is a common element of both producing cause and proximate cause. *See Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 481 (Tex. 1995).

11

or related misrepresentations, ERS accepted a risk that the funds advised by Putnam would be outperformed by the funds advised by other firms, just as it accepted a converse risk that the funds advised by Templeton and DuPont would be outperformed by the Putnam-advised funds. The risk that at least one investment firm would obtain comparatively disappointing returns is a risk created by the nature of the market, rather than any alleged misrepresentation by Putnam.[10] *See generally* Kevin S. Marshall & Kurt J. Beron, *Statistics and the Law: Proving Lost Profits*, 2 Tex. Wesleyan L. Rev. 467, 474 (1996) ("[I]t logically follows that in a lost profits case, the law requires . . . that other economic forces, which may also affect the plaintiff's profits, such as recent market fluctuations and developments, be controlled to rule out alternative explanations for the plaintiff's loss."). As a result, ERS's lost business opportunity damages are simply "unrelated to the misrepresentation," *Perry Equip. Corp.*, 945 S.W.2d at 817, and cannot satisfy the cause-in-fact requirement of proximate cause.

We hold that summary judgment was proper on ERS's lost business opportunity theory of damages because ERS did not, and could not, produce evidence establishing that Putnam's alleged wrongdoing was the proximate cause of the damages sought. ERS's second issue on appeal is overruled.

*Breach of Contract*

---

[10] Presumably, it was the mitigation of this risk that drove ERS's decision to divide the mandate among multiple investment advisors in the first place.

In ERS's third issue on appeal, it argues that the trial court erred in granting Putnam's motion for partial summary judgment on ERS's breach-of-contract claim. In its motion, Putnam argued that summer judgment was proper because there was no evidence of a contract breach, and alternatively, because ERS suffered no damages for which it could recover. Because we agree that ERS suffered no recoverable damages from any alleged breach of contract, we need not reach the issue of whether a breach actually occurred. *See Scott v. Sebree*, 986 S.W.2d 364, 372 (Tex. App.—Austin 1999, pet. denied) (existence of damages resulting from breach is essential element of breach-of-contract claim).

In connection with its breach-of-contract claim, ERS sought $75 million in lost opportunity damages and $8.6 million in transition costs incurred when it transferred advisory responsibility for the funds from Putnam to Templeton and DuPont. We have already determined, in disposing of ERS's second issue on appeal, that the lost opportunity damages did not result from Putnam's alleged wrongful act, making such damages unrecoverable in ERS's breach-of-contract claim. *See Stuart v. Bayless*, 964 S.W.2d 920, 921 (Tex. 1998). For the reasons discussed below, the transition costs sought by ERS are similarly unrecoverable as a matter of law.

ERS seeks its transition costs on the basis that PAC's breach of the contract compelled ERS to immediately sell the securities recommended by Putnam and replace them with securities recommended by Templeton and DuPont. Compensatory damages may only be recovered in a claim for breach of contract when the loss is a "natural, probable, and foreseeable consequence of the defendant's conduct." *Mead v. Johnson Group, Inc.*, 615 S.W.2d 685, 687 (Tex. 1981). The plaintiff must establish that his pecuniary loss was a result of the breach. *Prudential Sec., Inc.*

13

*v. Haugland*, 973 S.W.2d 394, 396 (Tex. App.—El Paso 1998, pet. denied). "The absence of this causal connection between the alleged breach and the alleged damages will preclude recovery." *Id.* at 397.

ERS's calculation of transition costs includes commissions and taxes incurred in selling the Putnam-advised securities, commissions and taxes incurred in purchasing new securities pursuant to the recommendations of Templeton and DuPont, and certain implicit costs related to both the sale and purchase of securities during the transition period.[11] However, ERS would have been faced with these costs any time its advisory relationship with PAC was terminated, which would have occurred—in the absence of any contract breach—either at the expiration of the contract or at the discretion of either party, with only a short notice period.

The contract between ERS and PAC was set to expire, by its own terms, on November 30, 2005, three years after its effective date, with the option of additional one-year renewals by agreement of the parties. The contract gave ERS the option of terminating the contract without cause by providing PAC with 30 days' written notice. Significantly, PAC also had the option of terminating the contract without cause by giving ERS 180 days' written notice. Therefore, under the terms of the contract, ERS was on notice that at any given time, it was only 180 days away from a termination of its advisory relationship with PAC and the transition costs that, according to ERS, would inevitably result. Given that the contract was set to expire after a three-year term, ERS

---

[11] ERS's expert generally described implicit costs, or "market impact" costs, as costs that occur because "if you want to buy in size, you generally have to pay more than the most recent transactions. Similarly, if you want to sell in size, in order to elicit enough buying interest you have to accept a lower price or a concession."

14

could not have reasonably anticipated that its advisory relationship with PAC would last forever. Transition costs for the Putnam-advised funds would have to be incurred at some point in the future. As ERS concedes, these costs represent the general cost of doing business in any investment advisor/advisee relationship.[12]

Because the transition costs incurred in selling the Putnam-recommended securities and purchasing new securities would have been incurred even in the absence of a breach, these costs do not represent a pecuniary loss resulting from PAC's alleged breach. *See Greer v. Varnell*,

---

[12] The following exchange took place during the deposition of Vince Smith, ERS director of international equity during ERS's relationship with PAC:

Q: And every time you have a—you have a change in the manager, ERS bears transition expenses, correct?

A: Oh, we do. Yes, they do.

Q: And those transition expenses are simply a part of the costs of doing business, correct?

A: Yes. When we change a mandate or a manager, you expect transaction costs.

. . .

Q: The transaction expenses that ERS incurred subsequent to its determination to fire PAC, are expenses that were going to be incurred by ERS at some point down the road when it made a change, correct?

A: Sure. Yes.

Q: With respect to the termination of PAC in 2003, all that's happened with respect to those transition expenses is that they were incurred earlier in time than they otherwise might have been, correct?

A: Yes. Yes. That's correct.

(Internal objections to form omitted.)

65 S.W. 196, 196-97 (Tex. Civ. App.—Austin 1901, no writ). *Greer* is instructive because it presents a simplified version of the facts at hand in the present case, in which a plaintiff seeks to recover costs that would have been incurred even in the absence of a contract breach. The plaintiffs in *Greer*, operators of a boarding house, entered into a commercial lease agreement with the intention of closing their boarding house and opening a store in the leased space instead. *Id.* at 196. However, after the plaintiffs notified their boarders that they were closing the boarding house, leading many of the boarders to make other arrangements, the lessor of the commercial space breached the lease contract. *Id.* In their suit against the lessor for breach of contract, the plaintiffs sought to recover damages resulting from their dismissal of the boarders in anticipation of starting the new business. *Id.* The court of civil appeals held that such damages were not recoverable, stating:

> If the defendant had complied with the lease contract, the plaintiffs would have immediately changed their business and ceased to derive any profit from keeping boarders; so that loss did not result from the defendant's breach of the contract, and would have been sustained if he had complied with it. This being the case, the court erred in submitting it as an element of damages . . . .

*Id.* at 196-97. This is analogous to the present case, in which ERS would have incurred the transition costs at some point in the future even if PAC had fully complied with the contract. Because these transition costs simply represent the general cost of doing business and would have been incurred in the absence of a breach, we conclude that ERS's transition costs did not result from any alleged breach by PAC.

16

Another analogous fact situation can be found in *GeoSurveys, Inc. v. State National Bank*, 143 S.W.3d 220, 225 (Tex. App.—Eastland 2004, no pet.), in which the plaintiff, alleging that the defendant bank breached an agreement to renew the plaintiff's note for another year, sought to recover the costs of moving its loan to a different bank. In reviewing the trial court's decision to affirm the resulting arbitration award, the court of appeals held that the evidence supported the arbitrator's findings that "the costs incurred in moving the loan were substantially the same as [the plaintiff] would have incurred if the loan were renewed for another year in March 2000, but not in March 2001" and that therefore such costs were not damages resulting from the breach. *Id.* In other words, the transition costs of moving the loan to a new bank were unrelated to the alleged breach because even if the defendant bank had complied with the agreement by renewing the note, the plaintiff would still have to pay transition costs if the bank chose not to renew the note the following year. We acknowledge that *GeoSurveys* is distinguishable in that it involves the review of an arbitration award under the Federal Arbitration Act, which is subject to a narrow standard of review and the presumption that awards will be confirmed. *See Tanox, Inc. v. Akin, Gump, Strauss, Hauer & Feld, L.L.P.*, 105 S.W.3d 244, 250 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). However, the reasoning demonstrated in *GeoSurveys*, particularly the notion that costs that would have been incurred even in the absence of a breach do not represent damages *resulting* from the breach, can be soundly applied to the facts of the present case. *See* 143 S.W.3d at 225.

A similar issue regarding transition costs as contract damages was addressed in *Platt Electric Supply, Inc. v. Menlo Logistics, Inc.*, Civ. No. 00-474-AS, 2002 U.S. Dist. LEXIS 7062, at *14 (D. Or. Mar. 19, 2002), in which the court held that the plaintiff, suing for breach of a contract

17

for the operation of a warehouse, could not recover the "general transition costs" incurred in "recovering the operation of the warehouse." In reaching this conclusion, the court stated:

> As noted above, the Agreement was for an initial five-year period with either party having the right to cancel every two years thereafter. Plaintiff would have had to incur these transitions costs whenever the Agreement was cancelled, whether under the terms of the Agreement or not. These costs are not the direct result of Defendant's breach of the Agreement and, therefore, are not recoverable under the terms of the Agreement.

*Id.*[13] The opinion in *Platt Electric Supply*, while not binding authority on this Court, illustrates the principle that bars ERS's recovery on its transition costs theory of damages—that these costs would have been incurred even in the absence of a breach and therefore did not result from PAC's breach, if any, of the contract.

In light of the foregoing analysis, we must also address ERS's contention that there are certain transition costs that would not have been incurred in the absence of the alleged breach. According to ERS, if PAC had not breached the contract at the moment it was signed, ERS never would have purchased the Putnam-advised securities and therefore never would have incurred the transition costs of selling those securities. ERS further argues that it incurred substantially higher transition costs than it otherwise would have by virtue of the fact that it was compelled to make a rapid transition out of Putnam-advised securities. However, even if we were to assume that these

---

[13] We note that the terms of the contract in *Platt* prohibited the recovery of consequential damages in the event of breach. *See Platt Elec. Supply, Inc. v. Menlo Logistics, Inc.*, Civ. No. 00-474-AS, 2002 U.S. Dist. LEXIS 7062, at *3 (D. Or. Mar. 19, 2002). Nevertheless, the analysis applied in *Platt* helps illustrate why the transition costs sought by ERS did not result from the alleged wrongful act and are therefore not recoverable as consequential damages. *See Bayless*, 964 S.W.2d at 921 ("[T]o be recoverable, consequential damages must be foreseeable and directly traceable to the wrongful act and result from it.").

costs would not have been incurred in the absence of the alleged breach, ERS's transition costs remain unrecoverable for the reasons that follow.

First, to allow ERS to recover the transition costs of selling the Putnam-advised securities would violate the principle of contract law that a non-breaching party may not be placed in a better position than if the contract had been performed. *See Mistletoe Express Serv. v. Locke*, 762 S.W.2d 637, 639 (Tex. App.—Texarkana 1988, no writ) (Grant, J., concurring) (citing "the fundamental tenet of contract law that an injured party should not be put in a better position than if the contract had been performed"). Summary-judgment evidence indicates that ERS received the benefit of PAC's advisory services in the form of approximately $80 million in profits realized from the sale of the Putnam-advised securities.

Second, the rapid nature of ERS's transition out of Putnam-advised securities was not a "natural, probable, and foreseeable consequence of the defendant's conduct." *Mead*, 615 S.W.2d at 687. In support of its argument that transition costs are recoverable, ERS cites the Restatement of Contracts, which states, "Incidental costs include costs incurred in a reasonable effort, whether successful or not, to avoid loss, as where a party pays brokerage fees in arranging or attempting to arrange a substitute transaction." Restatement (Second) of Contracts § 347 cmt. c (1981). The quoted language, however, illustrates a causal connection between the defendant's conduct and the alleged damages that is lacking in the present case. *See Prudential Sec.*, 973 S.W.2d at 397 (absence of "causal connection between the alleged breach and the alleged damages will preclude recovery"). This is not a case in which ERS incurred excessive transition costs in an attempt to mitigate damages resulting from PAC's alleged breach. It is undisputed that PAC's conduct had no direct financial

19

impact on ERS's investment portfolio. Because there was no danger of pecuniary loss, the transition costs related to rapidly replacing the Putnam-advised securities are not incidental costs incurred in an effort to avoid loss that otherwise would have been incurred as a result of the breach.

We also disagree with ERS's attempt to analogize this case to a breach-of-contract situation in which a landlord is awarded the costs incurred in arranging for a substitute tenant. While a landlord typically suffers a loss of rental income when a tenant breaches a lease contract and therefore must find a substitute tenant in order to mitigate that loss, ERS suffered no loss of investment advisory services as a result of PAC's alleged breach. ERS's decision to transition quickly out of Putnam-advised securities and into securities recommended by other advisors, however reasonable under the circumstances, was not an attempt to mitigate losses resulting from the alleged breach, but a voluntary decision by ERS to transition its entire Putnam-advised portfolio immediately. Given the facts that ERS maintained sole custody and control over its portfolio at all times, had the freedom to accept or reject PAC's investment suggestions at its discretion, and suffered no direct pecuniary loss to its investment portfolio as a result of the alleged breach, we fail to see how the alleged breach resulted in incidental damages in the form of increased transition costs. Because any increase in transition costs resulting from the rapid nature of the transition was not a "natural, probable, and foreseeable consequence of the defendant's conduct," these costs are not recoverable. *Mead*, 615 S.W.2d at 687.

For the reasons discussed above, we hold that summary judgment was proper on ERS's breach-of-contract claim because there is no evidence that ERS suffered any damages resulting from PAC's alleged breach of the contract. ERS's third issue on appeal is overruled.

20

*Actionable Misrepresentation*

In its first issue on appeal, ERS contends that the trial court erred in granting Putnam's motion for summary judgment dismissing ERS's tort claims on the basis that no actionable misrepresentation occurred. We need not address this issue because ERS may not recover either of the two measures of damages sought in relation to its tort claims—lost business opportunity damages and transition costs.

In our discussion of ERS's second issue, we determined that ERS could not, as a matter of law, establish the essential element of proximate cause in relation to the lost business opportunity damages sought for its tort claims. To the extent ERS also seeks to recover its transition costs in connection with its tort claims, this measure of damages suffers from the same defect—a lack of proximate cause. In our discussion of ERS's breach-of-contract claim, we concluded that ERS's transition costs were not a "natural, probable, and foreseeable consequence of the defendant's conduct," *id.*, and were therefore unrecoverable. For the same reasons, we hold that these transition costs were not proximately caused by Putnam's conduct. *See Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 549 (Tex. 1985) (explaining that to show proximate cause, plaintiff must establish cause-in-fact, which requires proof that negligent act or omission "was a substantial factor in bringing about the injury and without which no harm would have been incurred"). Because ERS cannot recover any damages sought in reference to its tort claims, we need not determine whether the trial court erred in granting summary judgment and dismissing those claims on the ground that no actionable misrepresentation occurred.

*Sovereign Immunity*

On cross-appeal, PAC argues that the trial court erred in granting ERS's plea to the jurisdiction and dismissing PAC's counterclaim for breach of contract. As a preliminary matter, we emphasize that ERS did not waive sovereign immunity by asserting it for the first time through a motion to modify, filed on the last day of the trial court's plenary power, because sovereign immunity deprives a trial court of subject-matter jurisdiction unless the State consents to suit, *Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 224 (Tex. 2004), and subject-matter jurisdiction cannot be waived by the parties and may be raised at any time, *see Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 445 (Tex. 1993). We now turn to PAC's two issues on cross appeal—that the trial court erred both (1) procedurally and (2) substantively in determining that sovereign immunity barred PAC's counterclaim against ERS for breach of contract.

**1.) Procedural Issues Related to ERS's Plea to the Jurisdiction**

PAC contends that the trial court erred in its procedural handling of ERS's plea to the jurisdiction by refusing to allow PAC to seek discovery regarding the jurisdictional issue, failing to treat PAC's pleaded jurisdictional allegations as true, and not requiring ERS to present evidence to support its assertion of sovereign immunity.

In arguing that the trial court should have allowed discovery before ruling on the plea, PAC cites *Miranda*, 133 S.W.3d 217. Under *Miranda*, a trial court is required to "consider relevant evidence submitted by the parties" when such evidence is "necessary to resolve the jurisdictional issues raised." *Id.* at 227. In the present case, however, the sole jurisdictional issue is ERS's status as a public entity. Whether ERS is a public entity subject to sovereign immunity is purely a question

of law, rather than, as PAC contends, a factual dispute hinging on questions such as the source of ERS's operating funds and its history, if any, of waiving immunity for disputes related to its investment activities. While a court deciding a plea to the jurisdiction is required to look beyond the pleadings to consider evidence "when necessary to resolve jurisdictional issues raised," there is no such necessity in the present case because there is no fact issue to be resolved. *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000). Therefore, the trial court did not err in declining to allow PAC to conduct discovery on the issue of jurisdiction. *See City of Kemah v. Vela*, 149 S.W.3d 199, 205 (Tex. App.—Houston [14th Dist.] 2004, pet. denied) (holding that trial court erred in denying plea to jurisdiction to allow additional discovery because facts were undisputed and "no additional discovery is needed for us to conclude that, as a matter of law, sovereign immunity is not waived").

A plea to the jurisdiction may be presented as either an attack on the sufficiency of the pleadings, as ERS has done here, or an evidentiary attack on the existence of jurisdictional facts. *See Miranda*, 133 S.W.3d at 226-27. PAC contends that regardless of which type of plea was filed here, the trial court erred, either by failing to treat PAC's pleaded jurisdictional allegations as true, as required for an attack on the pleadings, *see City of Celina v. Dynavest Joint Venture*, 253 S.W.3d 399, 402 (Tex. App.—Austin 2008, no pet.), or by failing to require ERS to present evidence to support its assertion of sovereign immunity, as required for an evidentiary attack, *see Miranda*, 133 S.W.3d at 228. Because ERS's plea to the jurisdiction did not challenge the existence of any jurisdictional facts, we need only address PAC's argument that the trial court erroneously failed to treat its pleaded jurisdictional allegations as true.

23

Our review of PAC's amended counterclaim reveals that what PAC describes as its "pleaded jurisdictional allegations" constitute either unsupported assertions of law or statements that are wholly irrelevant to the jurisdictional question of whether ERS is a public entity subject to sovereign immunity, such as, "ERS has never in any petition or answer filed in this lawsuit . . . asserted that it is a State agency nor that it enjoys any immunity from suit." Setting aside those statements that represent assertions of law and taking all of PAC's remaining "jurisdictional facts" as true, ERS remains subject to sovereign immunity as a matter of law, for reasons described more fully below. On that basis, we cannot conclude that the trial court erroneously failed to treat ERS's pleaded jurisdictional allegations as true.

While PAC contends that it is, at a minimum, entitled to an opportunity to amend its pleadings, we disagree on the ground that PAC's pleadings affirmatively negate the existence of jurisdiction. *See Texas A&M Univ. Sys. v. Koseoglu*, 233 S.W.3d 835, 840 (Tex. 2007) (stating that pleading defect could not be cured and opportunity to amend need not be allowed where plaintiff brought contract claim against State because "[m]erely pleading more facts in support of the breach of contract claim will not overcome Texas A&M's immunity from suit").

Finally, PAC argues that ERS waived any pleadings-based attack by asserting it in a post-judgment plea to the jurisdiction, citing the rule of procedure applicable to special exceptions. *See* Tex. R. Civ. P. 90. While pleadings-based pleas to the jurisdiction are treated like special exceptions to the extent that we construe the pleadings "in the plaintiff's favor and allow an opportunity to amend unless they affirmatively negate jurisdiction," *Miranda*, 133 S.W.3d at 244 (Brister, J., dissenting), it does not necessarily follow that the waiver rules applicable to special

24

exceptions can also be applied to a jurisdictional challenge. As previously discussed, subject-matter jurisdiction may be raised at any time. *See Texas Ass'n of Bus.*, 852 S.W.2d at 445.

We hold that the trial court did not err in its procedural handling of ERS's plea to the jurisdiction. PAC's first issue on cross-appeal is overruled.

**2.) Substantive Issues Related to ERS's Plea to the Jurisdiction**

ERS's existence is required by the Texas Constitution. *See* Tex. Const. art. XVI, § 67(b)(2) (requiring legislature to "establish by law an Employees Retirement System of Texas to provide benefits for officers and employees of the state"). The legislature complied with this mandate by creating ERS and enacting its governing statutes, chapters 811 through 815 of the government code. *See* Tex. Gov't Code Ann. §§ 811.001-815.512 (West 2004 & Supp. 2008). Under the government code, ERS is considered "a public entity," *id.* § 811.003, that enjoys "the powers, privileges, and immunities of a corporation, as well as the powers, privileges, and *immunities* conferred" by its governing statutes, *id.* § 811.004 (emphasis added).

While ERS points to a number of authorities to support its assertion of sovereign immunity, we need look no further than section 815.103 of the government code, which states, "The acceptance of benefits by the retirement system under a contract does not waive immunity from suit or immunity from liability." *Id.* § 815.103(e). We must presume that the legislature used every word of a statute for a purpose. *See City of Austin v. Southwestern Bell Tel. Co.*, 92 S.W.3d 434, 442 (Tex. 2002); *see also Hunter v. Fort Worth Capital Corp.*, 620 S.W.2d 547, 551 (Tex. 1981) (applying "the rule of statutory construction that the legislature is never presumed to do a useless act"). If ERS does not actually enjoy sovereign immunity, the legislature's express statement in

25

section 815.103(e) that ERS does not *waive* sovereign immunity by accepting benefits under a contract would be rendered mere surplusage. Accordingly, we conclude that ERS is a public entity subject to sovereign immunity from suit as a matter of law. Despite PAC's assertions to the contrary, we find no support for the proposition that the source of ERS's operating funds affects this analysis.

PAC does not assert that any statutory waiver of sovereign immunity is applicable to this case, but raises a number of equitable arguments for why ERS should be considered to have waived sovereign immunity. At the time ERS filed its suit in 2005, Texas Supreme Court precedent dictated that when a state agency or other governmental entity filed suit, it waived sovereign immunity for related counterclaims. *See Kinnear v. Texas Comm'n on Human Rights*, 14 S.W.3d 299, 300 (Tex. 2000) (per curiam) (holding that, where state agency initiated proceedings and defendant counterclaimed for attorney's fees, "the jurisdictional question in this case was answered when the [agency] filed suit"). Under the holding of *Kinnear*, ERS's action in filing its claims against PAC presumably would have been sufficient to waive its sovereign immunity for PAC's counterclaim. In 2006, however, the Texas Supreme Court limited *Kinnear* by issuing *Reata Construction Corp. v. City of Dallas*, 197 S.W.3d 371 (Tex. 2006) (op. on reh'g). In *Reata*, the court held that when a governmental entity files a lawsuit or otherwise seeks affirmative relief, it waives immunity for connected, germane, and properly defensive counterclaims, but only to the extent those counterclaims offset the claims of the government entity. 197 S.W.3d at 377 ("Absent the Legislature's waiver of the City's immunity from suit, . . . the trial court did not acquire jurisdiction over a claim for damages against the City in excess of damages sufficient to offset the City's recovery, if any.").

26

Because ERS took nothing on its claims against PAC, there was no recovery to be offset by PAC's counterclaims and therefore, under *Reata*, PAC's counterclaim is barred in its entirety by sovereign immunity, absent a legislative waiver from suit.[14] *See id.* PAC contends, however, that at the time ERS filed suit, it knowingly waived its sovereign immunity under the then-controlling holding of *Kinnear*. PAC further argues that applying the "subsequently created *Reata II* immunity" to this case would unconstitutionally deprive PAC of its vested rights in the contract with ERS.[15]

As a general rule, Texas Supreme Court decisions apply retrospectively. *See Elbaor v. Smith*, 845 S.W.2d 240, 250 (Tex. 1993). While exceptions may be recognized "when considerations of fairness and policy dictate prospective effect only," *id.*, the supreme court has not made such an exception for *Reata*. *See State v. Fidelity & Deposit Co. of Md.*, 223 S.W.3d 309, 311 (Tex. 2007) (reversing court of appeals decision, issued prior to *Reata*, because it "did not restrict Fidelity's counterclaims to a mere offset of [the State's] claims" as required by *Reata*); *State v. Precision Solar Controls, Inc.*, 220 S.W.3d 494, 494 (Tex. 2007) (per curiam) (reversing and remanding court of appeals decision affirming denial of plea to jurisdiction because decision "relied on our first opinion in [*Reata*] which we have since withdrawn and replaced"); *Port Neches-Groves*

---

[14]  If ERS had recovered on its claims, in which it sought damages exceeding $80 million, PAC's counterclaim for $796,095.89 plus interest would have offset ERS's recovery and sovereign immunity would have been waived. *See Reata Construction Corp. v. City of Dallas*, 197 S.W.3d 371, 377 (Tex. 2006) (op. on reh'g). ERS's delay in filing a plea in jurisdiction until after the take-nothing judgment was rendered might be explained, at least in part, by its expectation of this offset.

[15]  PAC refers to *Reata* as *Reata II* because it was issued as a substituted opinion on rehearing. While PAC discusses the original opinion in *Reata* at length, particularly its reaffirmation of the holding of *Kinnear* without limitation, that opinion was withdrawn and has no precedential value. *See Walden v. Affiliated Computers Servs., Inc.*, 97 S.W.3d 303, 330 n.22 (Tex. App.—Houston [14th Dist.] 2003, pet. denied).

*Ind. Sch. Dist. v. Pyramid Constructors, L.L.P.*, 201 S.W.3d 679, 680-81 (Tex. 2006) (reversing and remanding to allow party to make arguments based on *Reata*, which was handed down while case was pending on appeal). Given that the Texas Supreme Court has seen fit to apply its decision in *Reata* retrospectively, including to those cases pending on appeal at the time *Reata* was issued, we see no reason not to do so in the present case as well. Furthermore, "while, in a general sense, the laws in force at the time a contract is made enter into its obligations, parties have no vested right in the particular remedies or modes of procedure then existing." *American Sur. Co. v. Axtell Co.*, 36 S.W.3d 715, 720 (Tex. 1931) (quoting *Oshkosh Waterworks Co. v. Oshkosh*, 187 U.S. 437, 439 (1903)). As PAC concedes, it has not been deprived of all remedies under the contract, as it has the option of seeking a limited waiver of immunity by legislative consent. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 107.001-.005 (West 2005 & Supp. 2008).[16]

PAC attempts to distinguish the present case from *Reata* by arguing that this case involves only ERS trust funds, as opposed to "the public fisc." *See Reata*, 197 S.W.3d at 383 (Brister, J., concurring) (observing that "the protection sovereign immunity affords to the public fisc suggests that a government waiver by filing a claim should be limited to that claim's extent"). However, while the court in *Reata* reasoned that a "lack of immunity may hamper governmental

---

[16] We note also that, despite PAC's contention that allowing ERS to assert sovereign immunity would unconstitutionally deprive PAC of its vested rights under the contract, the contract itself contains the following provision:

> The parties agree and acknowledge that nothing contained herein shall in any manner be construed as a waiver of sovereign (governmental) or official immunity by ERS, its officers, directors, trustees, employees and agents, or the State of Texas, its officers and employees or agents, nor does ERS'[s] acceptance of any benefits under this Contract constitute any waiver, express, implied or otherwise, of sovereign immunity to suit or liability of ERS, its officers, directors, trustees, agents or employees.

28

functions by requiring tax resources to be used for defending lawsuits and paying judgments rather than using those resources for their intended purposes," it did not carve out a source-of-funds exception to the rule that when the State files suit, it waives sovereign immunity against related counterclaims only to the extent they offset the State's recovery. *Id.* at 375. Furthermore, the protection of public funds is not the sole purpose of sovereign immunity. *See Catalina Dev., Inc. v. County of El Paso*, 121 S.W.3d 704, 706 (Tex. 2003) (stating that "a fundamental reason why immunity exists" is "to prevent governmental entities from being bound by the policy decisions of their predecessors"); *Texas Natural Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 854 (Tex. 2002) (observing that "in the contract-claims context, legislative control over sovereign immunity allows the Legislature to respond to changing conditions and revise existing agreements if doing so would benefit the public" and "ensures that current policymakers are neither bound by, nor held accountable for, policies underlying their predecessors' long-term contracts").

While PAC makes a number of policy arguments for why sovereign immunity should not bar its counterclaim against ERS or why the result in this case is "inappropriate and unfair," these arguments must be directed to the legislature. *See IT-Davy*, 74 S.W.3d at 854 (stating that "the Legislature is better suited than the courts to weigh the conflicting public policies associated with waiving immunity"); *Federal Sign v. Texas S. Univ.*, 951 S.W.2d 401, 409 (Tex. 1997) ("[I]t is the Legislature's sole province to waive or abrogate sovereign immunity."). Furthermore, "if a party who contracts with the State feels aggrieved, it can seek redress by asking the Legislature to waive immunity from suit." *IT-Davy*, 74 S.W.3d at 854 (citing Tex. Civ. Prac. & Rem. Code Ann. §§ 107.001-.005); *see also General Servs. Comm'n v. Little-Tex Insulation Co.*, 39 S.W.3d 591, 597

(Tex. 2001) ("[T]here is but one route to the courthouse for breach-of-contract claims against the State, and that route is through the Legislature."). Accordingly, we decline to construct a judicial remedy to address PAC's policy arguments.

We similarly reject PAC's invitation to apply a "waiver-by-conduct" exception to the requirement that sovereign immunity may only be waived by the legislature. While the Texas Supreme Court once hinted that it might recognize waiver by conduct in the context of a contract claim, it has since declined to judicially adopt this doctrine in light of the legislature's creation of an administrative remedy for breach-of-contract claims against the State in chapter 2260 of the government code. *Compare Federal Sign*, 951 S.W.2d at 408 n.1 ("There may be . . . circumstances where the State may waive its immunity by conduct other than simply executing a contract so that it is not always immune from suit when it contracts."), *with IT-Davy*, 74 S.W.3d at 857 (refusing to fashion "a waiver-by-conduct exception in a breach-of-contract suit against the State," even where, as here, chapter 2260 is inapplicable). *See also* Tex. Gov't Code Ann. § 815.103(e) (subchapter C of government code chapter 2260 does not apply to ERS), §§ 2260.001-.108 (West 2008).

This Court has recognized the supreme court's rejection of the waiver-by-conduct doctrine since *Federal Sign*. *See Smith v. Lutz*, 149 S.W.3d 752, 761 (Tex. App.—Austin 2004, no pet.) ("The waiver-by-conduct exception once recognized by this Court . . . but rejected by the supreme court is not resurrected for those contracts that pre-date the effective date of the administrative remedies created in chapter 2260."). Like PAC, the appellant in *Smith* asked this Court to apply the waiver-by-conduct exception on the ground that his contract with the State was

30

not subject to chapter 2260. *Id.* We declined to do so, stating, "If the supreme court intends to recognize certain conduct as waiving immunity, we await its lead in identifying what that conduct might be." *Id.* Because this reasoning remains sound, we again decline to adopt a waiver-by-conduct doctrine in relation to sovereign immunity.[17]

Having previously determined that ERS is a State entity subject to sovereign immunity, we conclude that there is no applicable waiver and that PAC's breach-of-contract claim against ERS is therefore barred. PAC's second issue on cross-appeal is overruled.

## CONCLUSION

We affirm the trial court's judgment in its entirety.

_____

Diane M. Henson, Justice

Before Chief Justice Jones, Justices Puryear and Henson

Affirmed on Rehearing

Filed: July 30, 2009

---

[17] The First Court of Appeals has applied a waiver-by-conduct exception under "extraordinary factual circumstances," in which a State entity "lured" the plaintiff into a contract "with false promises that the contract would be valid and enforceable, then disclaimed any obligation on the contract by taking the position that the contract was not valid after all." *Texas S. Univ. v. State St. Bank & Trust Co.*, 212 S.W.3d 893, 907-08 (Tex. App.—Houston [1st Dist.] 2007, pet. denied) (op. on reh'g). ERS's conduct in this case does not rise to the level of "extraordinary factual circumstances" present in *State Street*. *See also Slade v. Texas S. Univ. Bd. of Regents*, 232 S.W.3d 395, 400 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (declining to apply *State Street* to "an ordinary contract dispute").

31