# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

June 30, 2011

No. 10-50677

Lyle W. Cayce
Clerk

BLUE GORDON, C.V.,

Plaintiff–Appellee   Cross–Appellant

v.

QUICKSILVER JET SALES, INCORPORATED,

Defendant–Appellant   Cross–Appellee

Appeals from the United States District Court
for the Western District of Texas
USDC No. 1:09-CV-409

Before KING, WIENER, and CLEMENT, Circuit Judges.

KING, Circuit Judge:[*]

Quicksilver Jet Sales terminated a written agreement with Blue Gordon for the lease and potential sale of a corporate aircraft, citing Blue Gordon's failure to cure a payment default under the agreement. Blue Gordon sued Quicksilver, alleging breach of contract and various tort claims. After the tort claims were dismissed on summary judgment, the jury returned a verdict in favor of Blue Gordon on its breach of contract claim. The district court denied Quicksilver's motions for judgment as a matter of law. Because there was no

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 10-50677

legally sufficient evidentiary basis for a reasonable jury to have found that Quicksilver wrongfully terminated the agreement, we reverse.

FACTUAL AND PROCEDURAL BACKGROUND

Quicksilver Jet Sales, Incorporated ("Quicksilver") and Blue Gordon, C.V. ("Blue Gordon") entered into a written lease agreement for Blue Gordon's use of a Gulfstream G-200 jet airplane owned by Quicksilver, with an option to purchase the aircraft at the end of the lease term (the "Agreement"). Under the terms of the Agreement, Blue Gordon agreed to pay the following sums: (1) an option fee of $5 million upon execution of the lease; (2) ten monthly rental payments in the amount of $1 million on the fifteenth day of each month during the term of the lease; (3) monthly interest payments on the fifteenth day of each month during the term of the lease; (4) the aircraft's operating expenses, including insurance, maintenance, fuel, and cost of the flight crew; and (5) specified late fees if payments were untimely. A grace period of fifteen days applied to the $1 million monthly rent and interest payments.

The Agreement required Quicksilver to provide Blue Gordon with notice in the event of a default. Upon receiving such notice, Blue Gordon had recourse to two different cure periods, depending on the type of payment that was in default. Under Section 3 of the Agreement, Blue Gordon would have thirty days to cure any default for rent, interest, and late fees. Under Section 18(b) of the Agreement, Blue Gordon would have ten days to cure any default for operating expenses and similar obligations. If Blue Gordon failed to cure the default, Quicksilver would have the right to terminate the Agreement, retain all payments, and repossess the aircraft.

From the date the Agreement was signed on November 24, 2008, to the date Quicksilver ultimately terminated the Agreement on April 22, 2009, Blue Gordon failed to make any timely payments under the Agreement. In March 2009, Quicksilver began sending default notices to Blue Gordon. On April 22,

2

No. 10-50677

2009, Quicksilver terminated the Agreement for the stated reason that Blue Gordon had failed to cure a properly noticed operating expense default of $58,637.45. At the time of termination, Blue Gordon was in arrears on approximately $1.2 million due under the Agreement. Quicksilver rejected Blue Gordon's post-termination attempts to cure the default that triggered the termination, as well as the other arrearages.

Blue Gordon filed suit against Quicksilver for breach of contract, claiming that Quicksilver had improperly terminated the Agreement, and pleading various tort claims against Quicksilver and three other defendants. On summary judgment, the district court dismissed the tort claims, and the case proceeded to the jury on the breach of contract claim. At the close of Blue Gordon's evidence, Quicksilver moved for judgment as a matter of law under Rule 50(a), citing the insufficiency of the evidence to support Blue Gordon's contention that Quicksilver had wrongfully terminated the Agreement. The district court took this motion under advisement.

The jury ultimately found that Quicksilver had improperly terminated the Agreement and awarded Blue Gordon $7.25 million in damages, over twice the amount Blue Gordon had requested. Quicksilver renewed its motion for judgment as a matter of law under Rule 50(b), challenging both the jury's finding on liability and the amount of damages, and moved in the alternative for a new trial. The district court denied this motion.

Quicksilver appealed the district court's final judgment and the denial of its post-trial motions. Blue Gordon cross-appealed the district court's allegedly insufficient award of attorneys' fees, as well as the district court's order granting summary judgment for Quicksilver on Blue Gordon's tort claims. Because we find that Quicksilver was entitled to judgment as a matter of law, we do not reach the issue of damages, nor do we address Blue Gordon's cross-appeal on its

No. 10-50677

attorneys' fees. We affirm the district court's grant of summary judgment to Quicksilver on Blue Gordon's tort claims.

## DISCUSSION

### I.    Breach of Contract Claim

We review the district court's denial of Quicksilver's motion for judgment as a matter of law *de novo*. *DP Solutions, Inc. v. Rollins, Inc.*, 353 F.3d 421, 427 (5th Cir. 2003). Judgment as a matter of law is proper when "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1); *see Boeing Co. v. Shipman*, 411 F.2d 365, 374 (5th Cir. 1969) (en banc), *overruled on other grounds by Gautreaux v. Scurlock Marine, Inc.*, 107 F.3d 331 (5th Cir. 1997) ("If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motion[ ] is proper.").[1]

Question One asked the jury: "Do you find, from a preponderance of the evidence, that Quicksilver wrongfully terminated and breached the contract on April 22, 2009?" The district court instructed the jury that the Agreement permitted Quicksilver to terminate the contract if the following three events occurred: (1) Blue Gordon failed to make one or more of its payments under the contract; (2) Quicksilver had given one or more notices of default identifying amounts owed by Blue Gordon; and (3) Blue Gordon failed to fully pay, within the time allowed under the contract, any one of the amounts identified in the notices of default.

---

[1] Blue Gordon argues that we should review for plain error only because Quicksilver failed to preserve its Rule 50(b) argument as to certain pieces of evidence in its pre-verdict Rule 50(a) motion. We disagree. Quicksilver presented the same ground—insufficiency of the evidence to show that Quicksilver's termination was improper—in both its Rule 50(a) and Rule 50(b) motions for judgment as a matter of law.

No. 10-50677

The particular event that precipitated Quicksilver's termination of the Agreement was Blue Gordon's failure to cure a default of $58,637.45 in operating expenses. These expenses included flight expenses incurred in February and March 2009 and insurance charges for the period from the lease's effective date until May 31, 2009.[2] The evidence was undisputed that: (1) Blue Gordon failed to make this payment; (2) Quicksilver gave Blue Gordon default notices identifying this amount owed; and (3) Blue Gordon failed to cure this default within the applicable ten-day cure period.

In light of these facts, Blue Gordon argued at trial that Quicksilver should have reallocated one or more of three earlier payments to cure the $58,637.45 operating expense default: (1) a $1 million payment made on April 6, 2009, which Quicksilver applied to the $1 million rent due on March 15; (2) a $200,000 payment made on January 16, 2009, which Quicksilver improperly applied to an "origination fee," but later applied to outstanding interest and late charges that had accrued since December 2008; or (3) two credit card payments totaling $80,500 made in January 2009, which were applied to operating expenses that Blue Gordon incurred in August 2008 and to prepay operating expenses for January 2009.

The district court instructed the jury as follows with regard to the application of payments:

> (1) Blue Gordon had the right, if it chose to do so, to tell Quicksilver how to apply the payments. If it wished to exercise this right, Blue Gordon was required to tell Quicksilver how to apply the payments.
>
> (2) If Blue Gordon failed to tell Quicksilver how to apply the payments, Quicksilver had the right to apply Blue Gordon's payments to Blue Gordon's debts in any manner which was not inequitable or unjust to Blue Gordon.

---

[2] Blue Gordon challenges the amounts billed for insurance, but as its revised figures would not impact the analysis here, we do not discuss this particular argument.

No. 10-50677

It is undisputed that, save for the two credit card payments made in January, Blue Gordon never explicitly told Quicksilver how to apply any of its payments. Therefore, the key question for the jury as to the first two contested allocations was whether Quicksilver's applications of those payments were "inequitable" or "unjust" such that Quicksilver's termination of the Agreement for failure to cure a breach was wrongful.

In its brief, Blue Gordon briefly argues that Quicksilver's allocations were unjust and inequitable under two general principles: first, that payments should be applied in such a way as to prevent default, *see Wagner & Brown, Ltd. v. Sheppard*, 282 S.W.3d 419, 429 & n.55 (Tex. 2008); and second, that payments should be applied to the oldest outstanding debt, *see First Nat'l Bank in Dallas v. Whirlpool Corp.*, 517 S.W.2d 262, 269 (Tex. 1974), which would have given preference to the $58,637.45 operating expense deficit invoiced on March 6 over the $1 million rent deficit that became due on March 15. Blue Gordon also points to statements made by its lawyer, in certain emails to Quicksilver, professing Blue Gordon's desire to comply with the Agreement.[3]

These arguments are unconvincing. First, the general rule that payments should be applied to the oldest outstanding debt "has been restricted to the extent that when the debtor makes a payment without exercising his right to direct the application thereof, the creditor may appropriate it to such debts due from the debtor as he chooses, provided he does not make an application that is

---

[3] Blue Gordon also cites three cases to support its position that Quicksilver's allocation of Blue Gordon's payments was improper. However, none of the cited cases supports Blue Gordon's position. The first case actually works against Blue Gordon. *See N.Y. Life Ins. Co. v. Statham*, 93 U.S. 24, 35 (1876) (holding that life insurance policies were properly terminated for failure to pay insurance premiums, even though the failure to pay was occasioned by the Civil War). The other two cases concern insurance companies that were obligated, under contract or under the common law, to pay the insured a monetary benefit sufficient to cover his payment default. *See Timmerman v. Bankers' Reserve Life Co.*, 63 S.W.2d 687 (Tex. 1933); *Mo. State Life Ins. Co. v. Le Fevre*, 10 S.W.2d 267 (Tex. Civ. App.—Waco 1928, writ dism'd w.o.j.). Here, there was no such obligation.

6

No. 10-50677

inequitable and unjust to the debtor." *Hodges v. Price*, 163 S.W.2d 868, 871 (Tex. Civ. App. 1942, writ ref'd w.o.m.). The district court correctly instructed the jury on this point, and Blue Gordon did not object to the court's statement of the law.

Furthermore, Blue Gordon's professed desire to perform under the Agreement and the general principle that "equity abhors forfeiture" are insufficient to overcome the fact that the evidence and inferences in this case point strongly and overwhelmingly in favor of Quicksilver. Ultimately, it was not the jury's prerogative to apply Blue Gordon's payments in whatever manner would avoid a result that Blue Gordon argued was "a pretty harsh circumstance." Quicksilver's only duty under the law was to apply Blue Gordon's payments in a way that was fair and equitable, not to act in furtherance of Blue Gordon's best interests. The facts show no evidentiary basis to find that Quicksilver's allocations of the payments were unfair or inequitable, and thus to determine that Quicksilver's termination of the Agreement was wrongful.

## A.    Application of the April $1 Million Payment to Rent

Blue Gordon first argued that Quicksilver should have applied a $1 million payment made on April 6, 2009, to the $58,637.45 operating expense default rather than to the $1 million monthly rent payment that was due on March 15, 2009. However, Blue Gordon did not present any evidence at trial to support this theory. All the evidence at trial—including testimony from Blue Gordon's expert witness and its trial representative—showed that the $1 million payment was properly paid, accepted, and applied as a monthly rental payment, not a payment of operating expenses. A time line of events is helpful to understand this point.

Blue Gordon failed to make its $1 million monthly rent payment on February 15, 2009. Quicksilver sent a notice to Blue Gordon on March 2, informing Blue Gordon that it was in default on its February rent payment. After receiving this notice, Blue Gordon wired $1 million to Quicksilver on

7

No. 10-50677

March 5, which Quicksilver then applied to the February rent default. Blue Gordon next missed its March 15 rent payment. On April 6, Quicksilver sent Blue Gordon an email reminder that its $1 million rent payment for March was overdue. That same day, Blue Gordon initiated a wire transfer of $1 million to Quicksilver, which Quicksilver received on April 8 and applied to the March rent default.

On April 7, Quicksilver (which had not yet received Blue Gordon's $1 million wire transfer initiated on April 6) sent Blue Gordon two separate notices of default. One cited the failure to make the March 15, $1 million monthly rent payment along with $316,883.59 in monthly interest payments and late fees that had accrued from December through March. This notice of default triggered a thirty-day cure period under Section 3 of the Agreement.

The second notice of default cited the failure to pay operating expenses of $58,637.45, which had been invoiced on March 6, 2009, and billed to Blue Gordon via email on March 13, 2009. The notice ended by stating: "This situation is serious and must be corrected to avoid cancellation per paragraph 18(b) of the Agreement." This notice of default triggered the ten-day cure period for operating expenses under Section 18(b) of the Agreement.

On April 13, Quicksilver sent Blue Gordon an email urging payment of a past due amount of $375,521.04, which represented the amalgamation of the unpaid interest and late fees of $316,883.59 cited in the first notice of default and the unpaid operating expenses of $58,637.45 cited in the second notice of default. Quicksilver also urged timely payment of the $1 million plus interest monthly rental payment coming due on April 15.

On April 15, Quicksilver sent Blue Gordon a bill for $131,532.82 in operating expenses, which included the past due balance of $58,637.45 in operating expenses, plus $72,895.37 in new charges. Blue Gordon's pilot, Armando Garcia, responded by sending Quicksilver an email stating that Blue

Gordon's accountant "a[l]ready did April's payment and he didn't know anything about the flight [ex]penses . . . [but] they should do payment by [Fri]day at the most (hope so) . . . ."

On April 16, Quicksilver emailed Blue Gordon that $375,521.04 (the same arrearage cited in Quicksilver's April 13 email) was past due "not includ[ing] the latest operating expense[s]" of $72,895.37 cited in Quicksilver's April 15 email, and that "April's payment in the amount of $1,029,083.33 [the $1 million rent payment plus interest] was due yesterday." The attached statement showed that Blue Gordon's $1 million payment initiated on April 6 and received on April 8 was applied to the lease payment/"aircraft purchase" balance, leaving the $58,637.45 operating expense balance and other amounts comprising the $375,521.04 unpaid.

On April 17, the ten-day cure period for the $58,637.45 default in operating expenses expired. Blue Gordon failed to cure this default as promised in Garcia's April 15 email. On April 20, Quicksilver sent Blue Gordon an email inquiring: "Any progress on the expense money payment?" Blue Gordon did not respond. On April 21, Quicksilver sent Blue Gordon the following urgently-worded email in capital letters:

> Your clients [sic] payment was due April 15th and has not been paid. Our owner has in the past made these payments to keep your client from being in default. I have been advised that this will no longer be done and we are not going to continue this relationship going on those [sic] basis.

> Our owner is out of town today, but has scheduled a meeting tomorrow morning at 10am to review this agreement. Please be advised that at that time he may order this agreement terminated because of your clients [sic] continued callous disregard of the rules of the agreement. We have sent all the required notices and can rightfully cancel this agreement and your client would loose [sic] the money paid to this date. To keep this from happening I request that they wire funds in the morning to cover all monies due.

No. 10-50677

This is very serious so please pass this along to your client ASAP.

That same day, Luis Trillo, Blue Gordon's lawyer, emailed Quicksilver stating that he had been informed that "the April payment had alre[a]dy been sent" and stating that he was requesting immediate payment of "the pending amounts 375K." This "375K" figure most closely approximates the $375,521.04 mentioned in Quicksilver's email of April 13, representing the sum of the unpaid interest and late fees cited in the first April 7 notice of default and the unpaid operating expenses of $58,637.45 cited in the second April 7 notice of default. However, Blue Gordon failed to wire additional amounts as promised.

On April 22, after ascertaining that no wire transfers had been received, Quicksilver terminated the lease and sent Blue Gordon notice of its decision. Blue Gordon responded with an email referencing the thirty-day cure period (which would apply to the $1 million monthly rent, not to the default in operating expenses), and stating that "the big payment . . . for April" had already taken place and promising that the remaining amounts would be paid that day.

Later that afternoon, Blue Gordon initiated a wire transfer for the $316,883.59 default cited in the first April 7 notice, which was subject to a thirty-day cure period. On April 23, Blue Gordon initiated a wire transfer as to the $58,637.45 operating expense balance for which the ten-day cure period had elapsed on April 17. Quicksilver rejected both attempted wire transfers.

This time line of events, established in the record and uncontested at trial, supports Quicksilver's application of the $1 million payment to monthly rent in several ways. First, the timing of this April 6 payment, which was initiated _after_ an email reminder of the $1 million default in monthly rent (on April 6), but _before_ notice of the default in operating expenses (on April 7), supports the reasonable inference that the $1 million was meant to be applied to the default in rent. This inference is strengthened by the fact that Blue Gordon's previous

10

$1 million dollar payment in March had been applied to February's past due rent under almost identical circumstances without objection from Blue Gordon.

Second, the communications between Quicksilver and Blue Gordon show that Blue Gordon intended and understood that the $1 million payment would be applied toward rent and that it had not paid the operating expenses of $58,637.45. This contemporaneous understanding was reinforced by the testimony of Blue Gordon's own witnesses at trial. Luis Trillo testified at trial that he communicated to Quicksilver that "it was [his] impression that [the $1 million payment] was a payment for the latest—for a 30-day cure period." Blue Gordon's pilot, Armando Garcia, sent an email on April 15 that also shows this same understanding—the "April payment" had already been made, leaving the "flight expenses" outstanding. Likewise, when pressed during cross-examination, Blue Gordon's accounting expert, Brian Finley, opined that applying the $1 million payment to the $1 million rent default was proper accounting: "Based on what I've looked at in this case, I would think that would be the likely thing that Quicksilver would have done on their schedule. They would apply the $1 million into the column under rentals from an accounting perspective." He also testified that it would not be a proper accounting practice to split the $1 million payment among multiple allocations.

At a minimum, Blue Gordon acquiesced in the application of the $1 million to rent by failing to protest or request a different allocation when Quicksilver showed Blue Gordon in its email on April 16 that it had allocated the $1 million payment to March's past due rent. *See* 58 Tex. Jur. 3d *Payment* § 70 (2006) ("[W]here the obligor mistakenly fails to direct the application and the obligee applies the payment to a debt other than the one intended by the obligor, the obligee should correct the mistake soon after his attention is called to it."). Blue Gordon's lawyer agreed with Quicksilver's counsel at trial that "Blue Gordon got

clear communication how Quicksilver was allocating [the April $1 million payment], and Blue Gordon did not give instructions for a different allocation."

Not one witness at trial suggested that the April $1 million payment was for anything but rent. There was thus no legally sufficient evidentiary basis for a reasonable jury to have found that the April 6, 2009 payment of $1 million should have been allocated to the operating expense balance of $58,637.45.

## B. Application of the January $200,000 Payment to Interest and Late Charges

Blue Gordon next argues that a $200,000 payment made on January 16, 2009, should have been applied to the $58,637.45 operating expense default. Quicksilver originally allocated this payment toward a $250,000 "origination fee" that Quicksilver believed its lender would charge as a consequence of Blue Gordon's late payments. Ultimately, no such fee was charged, and Quicksilver acknowledged at trial that Blue Gordon therefore did not owe this fee.

The evidence at trial—including testimony from Blue Gordon's own expert, Brian Finley—uniformly supported Quicksilver's position that the proper application of this "extra" $200,000 payment would have been to the outstanding default for interest and late charges that had accrued, starting in December 2008, in excess of $220,000 as of February 2009. Finley disputed the specific amounts of the interest and late charges, contending that the proper amount was $194,778.12. However, even under this revised calculation, there would not be sufficient funds left from the $200,000 payment to cover the $58,637.45 in expenses that were billed in March and which Blue Gordon failed to pay.

Even if this $200,000 payment had been applied toward the $58,637.45 default in operating expenses, there is another default that Blue Gordon would have failed to timely cure such that termination of the Agreement would have been proper. Blue Gordon defaulted on the monthly interest due on February 15, which Quicksilver properly noticed on March 2. This default was subject to

a cure period of thirty days, which ended on April 2. The only avenue by which Blue Gordon can claim to have cured this default is by application of the $200,000 payment to the cumulative $194,778.12 (using Blue Gordon's figure) in outstanding interest and late charges, which included this February interest and which predated the $58,637.45 in operating expenses. In other words, the $200,000 payment could not apply to cure both Blue Gordon's default for failure to pay interest and late charges as well as Blue Gordon's default for failure to pay operating expenses.

### C. Application of January 2009 Credit Card Payments to August 2008 Operating Expenses

Blue Gordon made two credit card payments in January 2009 totaling $80,500. Blue Gordon argues that $39,030.84 of these payments, which were incurred through Blue Gordon's use of the aircraft in August 2008 prior to entering the Agreement, should have been allocated toward the $58,637.45 operating expense default.

No evidence at trial supported this allocation. In fact, the undisputed evidence showed that the parties expressly agreed as to the allocation of the credit card payments at the time they were made—an exception to Blue Gordon's usual silence about how its payments should be applied. Blue Gordon agreed in writing to be responsible for operating expenses beginning in August 2008. As of January 2009, Blue Gordon still had not paid the operating expenses for the flights it took in August. In anticipation of January flights, the parties agreed that Blue Gordon would make two credit card payments: one payment to pay Blue Gordon's outstanding August 2008 flight expenses of $39,030.84, and a second payment to prepay the anticipated January 2009 flight expenses, which was roughly the balance of the total $80,500 paid. There was no testimony from any witness that reallocating these credit card payments to the $58,637.45 operating expense default would have been proper. And because the parties

themselves agreed to the challenged payment allocation, Quicksilver's allocation was indisputably proper.

Given the lack of evidence at trial, we hold that no reasonable jury could have found that Quicksilver's applications were unjust or inequitable such that Quicksilver wrongfully terminated the Agreement.

## II.    Tort Claims

In addition to its breach of contract claim, Blue Gordon asserted tort claims for conversion, fraud, tortious interference with contract, unjust enrichment, and quantum meruit against Quicksilver and three other defendants.    The district court granted Quicksilver's pre-trial motion for summary judgment as to these claims. On cross-appeal, Blue Gordon challenges the district court's order granting summary judgment as to its fraud claims only.

We review the district court's grant of summary judgment *de novo*, applying the same standards as the district court.    *United States v. Caremark, Inc.*, 634 F.3d 808, 814 (5th Cir. 2011).  Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  We view the evidence in the light most favorable to the non-moving party. *Caremark*, 634 F.3d at 814.  Finally, we are not limited to reviewing the grounds cited by the district court for granting summary judgment; we may affirm on any grounds supported by the record.  *Wells v. SmithKline Beecham Corp.*, 601 F.3d 375, 378 (5th Cir. 2010).

Blue Gordon appears to have asserted two different fraud claims: fraudulent inducement and fraud by nondisclosure.[4]   "Texas law has long imposed a duty to abstain from inducing another to enter into a contract through the use of fraudulent misrepresentations."  *Formosa Plastics Corp. USA v.*

---

[4] Although these are two separate torts under Texas law, Blue Gordon conflates them in its briefing.  We discuss them separately to avoid confusion.

14

No. 10-50677

*Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 46 (Tex. 1998). A cause of action for fraudulent inducement requires the plaintiff to show "a material misrepresentation, which was false, and which was either known to be false when made or was asserted without knowledge of its truth, which was intended to be acted upon, which was relied upon, and which caused injury." *Id.* at 47 (citations and internal quotation marks omitted). Blue Gordon alleged that Quicksilver fraudulently induced it to enter into the Agreement through the misrepresentation that Quicksilver intended to perform under the Agreement, when in fact Quicksilver lacked the financial and legal ability to do so. *See id.* at 48 ("A promise of future performance constitutes an actionable misrepresentation if the promise was made with no intention of performing at the time it was made." ); *see also Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986) (holding that "[a] promise to do an act in the future is actionable fraud when made with the intention, design and purpose of deceiving, and with no intention of performing the act"). Specifically, Blue Gordon claimed that Quicksilver did not have the unfettered right to sell or even to lease the aircraft because Quicksilver's lender had a "first-priority and sole perfect[ed] security interest in, with a power of sale over," the aircraft, and the necessary conditions to obtain the right to lease or sell the aircraft had not been met.

Blue Gordon also claimed that Quicksilver's failure to disclose information about its relationship with its lender in its negotiations with Blue Gordon constituted fraud by nondisclosure. To establish a claim for fraud by nondisclosure, a plaintiff must show that: (1) the defendant concealed or failed to disclose a material fact within his knowledge to the plaintiff; (2) the defendant had a duty to disclose this fact; (3) the defendant knew that the plaintiff was ignorant of the fact and did not have an equal opportunity to discover the truth; (4) the defendant intended to induce the plaintiff to take some action by concealing or failing to disclose the fact; (5) the plaintiff relied on the defendant's

nondisclosure; and (6) the plaintiff suffered injury as a result of acting without knowledge of the undisclosed fact. *See Bradford v. Vento*, 48 S.W.3d 749, 754–55 (Tex. 2001); *Worldwide Asset Purchasing, L.L.C. v. Rent-A-Center East, Inc.*, 290 S.W.3d 554, 566 (Tex. App.—Dallas 2009, no pet.).

Although fraudulent inducement and fraud by nondisclosure are two separate claims, both causes of action required Blue Gordon to show that its injury—the ultimate termination of the Agreement—was caused by Quicksilver's alleged misrepresentations or nondisclosures. Under Texas law, a plaintiff must prove that a defendant's actions proximately caused the harm in order to recover consequential damages, *see Emps. Ret. Sys. of Tex. v. Putnam, LLC*, 294 S.W.3d 309, 316–17 (Tex. App.—Austin 2009, no pet.), or must show that the harm "result[ed] directly and naturally" from the fraud in order to recover general damages, *Scott v. Sebree*, 986 S.W.2d 364, 371 (Tex. App.—Austin 1999, pet. denied). Blue Gordon fails to meet either causation standard. Contrary to Blue Gordon's contention, it is not sufficient to show that Blue Gordon would not have entered into the Agreement if Quicksilver had not made the alleged misrepresentations or nondisclosures; that allegation goes to the element of reliance. Rather, Blue Gordon must show that Quicksilver's misrepresentations or nondisclosures caused the injury Blue Gordon suffered. Here, the cause of Blue Gordon's injuries was its own failure to cure defaults under the Agreement, which had no causal connection to Quicksilver's alleged misrepresentations or nondisclosures. Blue Gordon therefore failed to raise a genuine issue of material fact as to this necessary element of its claims for fraudulent inducement and fraud by nondisclosure, and we affirm the district court's grant of summary judgment on that basis.

## CONCLUSION

For the foregoing reasons, the district court's judgment denying Quicksilver's motion for judgment as a matter of law and for a new trial is

No. 10-50677

REVERSED and REMANDED with instructions to enter a take-nothing judgment against Blue Gordon. The district court's order awarding attorneys' fees to Blue Gordon is VACATED. The district court's order granting summary judgment in favor of Quicksilver on Blue Gordon's tort claims is AFFIRMED. Blue Gordon shall bear the costs of this appeal.