# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-23-00263-CV

Appellants, Quantum Plus, LLC; and Lonestar Hospital Medicine Associates, P.A.//
Cross-Appellant, Hospital Internists of Austin, P.A.

v.

Appellees, Hospital Internists of Austin, P.A.; Hospital Internists of Texas; and
Texas APN, LLC// Cross-Appellees, Quantum Plus, LLC; and
Lonestar Hospital Medicine Associates, P.A.

### FROM THE 419TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-19-007224, THE HONORABLE CATHERINE MAUZY, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Quantum Plus, LLC, (Quantum) and Lonestar Hospital Medicine Associates, P.A., (Lonestar), defendants below,[1] appeal the trial court's final judgment on a jury verdict. The trial court's final judgment awards Hospital Internists of Austin, P.A., (HIA), plaintiff below, damages and attorneys' fees on its claim against Quantum for breach of contract. The final judgment also finds Quantum and Lonestar jointly and severally liable to Texas APN, LLC (TAPN) and to Hospital Internists of Texas (HIT), both also plaintiffs below, for "actual damages for conspiracy" related to their claims against Quantum and Lonestar for tortious interference with contract.

---

[1] Quantum and Lonestar are both affiliates of physician-staffing firm TeamHealth Holdings Incorporated, an entity that affiliates with physician groups to provide medical staff for its hospital clients.

Quantum and Lonestar raise four issues on appeal, asserting that the trial court erred by (1) denying a motion for judgment notwithstanding the verdict on HIA's breach of contract claims; (2) overruling objections to the charge, resulting in the rendition of an incorrect judgment; (3) denying a motion for judgment notwithstanding the verdict based on the verdict's improper inclusion of an award of damages for "conspiracy"; and (4) denying a motion for judgment notwithstanding the verdict because the verdict improperly includes an award of attorneys' fees for a claim for which HIA recovered no damages and, alternatively, because HIA failed to segregate its fees. HIA filed a cross-appeal complaining of the trial court's summary judgment that HIA was not entitled to recover on one of its breach of contract claims. We will affirm the trial court's judgment in part, and reverse and render judgment in part.

## BACKGROUND

Pursuant to a contract with St. David's Healthcare, effective February 2015, Quantum became the exclusive provider of professional hospital medicine by physicians and non-physicians for the hospital medical programs of five of St. David's Healthcare-affiliated hospitals in Austin and Georgetown. To fulfill its contractual obligations to St. David's Healthcare, in January 2015 Quantum entered into a Services Agreement with HIA pursuant to which HIA would provide "all professional hospital medicine coverage in the form of Texas licensed and qualified physicians ('Physicians') and advanced practice clinicians, including physician assistants and nurse practitioners ('APCs') in the hospital medicine programs" of the five hospitals. HIA agreed to be "solely responsible" for supplying the physicians and APCs to provide all professional hospital medicine services at the five hospitals and for compensating the physicians and APCs for all salaries, wages, and other expenses and benefits incidental to their employment or retention.

As compensation to HIA, Quantum agreed to pay HIA, on a monthly basis, "an amount equal to HIA's total costs incurred in providing Physicians and APCs." The Agreement defined "Total Costs Incurred" to "include, but not be limited to, all Physician and APC compensation in the amounts set forth in Exhibit 'A' to this Agreement" along with "other reasonable expenses, incurred for and directly related to the performance of" HIA's obligations under the Services Agreement. The Services Agreement also included the following provision in Section 24:

> 24. Compliance with Government Laws and Regulations. The parties agree to comply in all respects with applicable federal, state and local statutes, rules and regulations, including but not limited to any anti-kickback or Fraud and Abuse laws or regulations related to Medicaid and Medicare patients and programs and any legislation passed with respect to patient referrals. In the event that any term or condition of this Agreement or the application thereof to any person or event shall, in the opinion of [Quantum], HIA, or either party's counsel, violate or potentially violate any laws, orders, rules or regulations currently enforced by or hereafter promulgated by any federal, state, municipal or other governmental authority or agency [], the parties agree to negotiate in good faith to amend or modify this Agreement so that it complies with such laws or regulations, using their best efforts to preserve the rights and obligations of each party as nearly as possible and minimize the economic effect on both parties.

The Services Agreement also contained a "noninterference" provision, Section 8, which provided that, during the term of the Services Agreement, neither party would:

> (i) solicit or hire any person or entity who is currently working, or during the most recent six months of this agreement was working, as an employee or contractor (including contract physicians) for [Quantum] to work in a Hospital, Skilled Nursing Facility, or other location that is located within a ten (10) mile radius around the person's last [Quantum] work location; and (ii) solicit, induce, or attempt to induce any person or entity (including, but not limited to, hospitals) doing business with the other party to terminate such relationship or engage in any activity that will cause substantial and irreparable harm to the other party's business.

The Services Agreement was for a term of three years unless terminated by either party pursuant to provisions of Section 7 governing termination by either Quantum or HIA.

In February 2018, HIA advised Quantum that it had "elected to terminate" the Services Agreement pursuant to section 7.3 of the Agreement, asserting that Quantum had violated the Services Agreement by soliciting the employment of physicians employed by HIA and HIT. That section provided: "Following the first twelve (12) months of this Agreement's term, either party may terminate this Agreement without cause upon no less than one hundred twenty (120) days prior written notice to the other party." HIA informed Quantum that the Services Agreement would terminate on June 8, 2018. In October 2019, HIA sued Quantum and Lonestar alleging causes of action for breach of contract, tortious interference with contract, and conspiracy to interfere with existing contracts. HIA also sought attorneys' fees pursuant to section 38.001 of the Texas Civil Practice and Remedies Code. *See* Tex. Civ. Prac. & Rem. Code § 38.001 (providing for recovery of reasonable attorneys' fees if claim is based on oral or written contract). In its live pleadings, HIA alleged that Quantum breached the Services Agreement by (1) controlling and attempting to control HIA providers in violation of state law, specifically the prohibition on the corporate practice of medicine, and in contravention of Section 24 of the Services Agreement; (2) "soliciting, hiring, inducing, and/or attempting to induce" HIA contracted providers in contravention of Section 8 of the Agreement; and (3) failing to pay HIA its "Total Costs Incurred" pursuant to the Agreement's compensation provision. HIA alleged that these "material breaches created intolerable conditions and left HIA no reasonable choice but to terminate" the Agreement. HIA alleged that "as a proximate result of the material breaches and resulting and foreseeable termination, HIA lost the benefit of the bargain []. Specifically, HIA sustained damages in the form of lost business profits that it would have enjoyed had [Quantum] not breached and the

4

Services Agreement continued pursuant to its terms—specifically the profits reasonably expected, based on HIA's historical income under the Services Agreement, to be generated by payments due under the Services Agreement for HIA's professional services."

As the basis for its tortious interference claim, HIA alleged that Quantum and Lonestar willfully and intentionally interfered with its contract with HIT,[2] with HIT's contracts with TAPN, and with HIT's and TAPN's noncompetition covenants with their respective employees. HIA also alleged that Quantum and Lonestar "were members of a combination of two or more business entities that conspired to improperly recruit HIT and TAPN's employees" and that the objective of the conspiracy was to "tortiously interfere with HIA, HIT, and TAPN's contracts with their respective employees and contractors, including the noncompetition restrictive covenants therein, and the services subcontracts executed between HIA and HIT and HIT and TAPN."

After a thirteen-day jury trial, the jury found that Quantum breached Section 24 of the Agreement by "failing to comply in all respects with applicable state statutes, rules, or regulations" and breached Section 8 of the Services Agreement by "soliciting or hiring any contractor of HIA to work for Lonestar on or before June 8, 2018, in any location withing a ten mile radius around the person's last work location." The jury awarded damages of approximately $4.5 million and $438,000 for each breach, respectively. The jury also found that either Quantum or Lonestar interfered with covenants not to compete contained in TAPN's contracts with seven nurse practitioners, awarding TAPN damages of approximately $354,000, and that either Quantum or Lonestar interfered with covenants not to compete contained in HIT's contracts with six

_____

[2] HIA contracted with HIT to provide professional medical services and HIT in turn contracted with TAPN to provide advanced practice clinician services.

5

physicians, awarding HIT damages of approximately $340,000. Finally, the jury found that either Quantum or Lonestar were part of a conspiracy to interfere with TAPN's employment contracts with nurse practitioners, HIT's employment contracts with physicians, HIA's contract with HIT, and HIT's contract with TAPN. The jury awarded damages of $700,000 "caused by the conspiracy of the Defendants" to interfere with TAPN's employment contracts with the nurse practitioners, and $1,200,000 "caused by the conspiracy of the Defendants" to interfere with HIT's employment contracts with the physicians. The jury also awarded attorneys' fees of approximately $864,000 for legal services for HIA's claim for breach of contract based on Quantum's noncompliance with Section 24 (its failure to comply with applicable state statutes, rules, and regulations) and the same amount of fees for legal services based on HIA's claim for breach of contract based on Quantum's noncompliance with Section 8 (its solicitation or hiring of HIA employees or contractors to work for Lonestar on or before June 8, 2018).

Quantum moved for judgment notwithstanding the verdict asserting, in relevant part, that HIA could not recover on its claim for breach of Section 24 of the Agreement because (1) the statutes, rules or regulations on which HIA based its breach of contract claim were not expressly incorporated into the Agreement; (2) there was no evidence that Quantum's alleged breach caused the damages HIA sought to recover; and (3) because the Agreement was terminable at will, HIA's evidence was legally insufficient to establish lost profits with reasonable certainty. Quantum also challenged the trial court's rendition of judgment on the jury's verdict awarding attorneys' fees for the Section 8 breach of contract claim. In post-trial motions, Quantum and Lonestar also asserted that the court erroneously rendered judgment on the jury's award of damages for conspiracy, which they maintained was a derivative claim that could not support an award of damages. The trial court denied all Quantum's and Lonestar's post-trial motions and

6

rendered judgment awarding HIA breach-of-contract damages of $4,517,623 along with attorneys' fees of $1,729,759 and contingent appellate attorneys' fees. The trial court awarded TAPN $700,000 in "damages for conspiracy" related to Quantum's and Lonestar's interference with non-competition provisions in its contracts with seven nurse practitioners and awarded HIT $1,200,000 in "damages for conspiracy" related to Quantum's and Lonestar's interference with its contracts with six physicians. This appeal followed.

## DISCUSSION

### Challenge to Judgment for Breach of Contract

In its first issue, Quantum challenges the trial court's denial of its motion for judgment notwithstanding the verdict and its rendition of judgment on the jury's verdict on HIA's breach of contract claim. The jury answered "Yes" to the following question:

> **Question 1**: Did Defendants fail to comply with the Services Agreement by:
>
> a.    Failing to comply in all respects with applicable state statutes, rules, or regulations (Section 24)? Answer yes if Quantum failed to comply.

At trial, HIA presented evidence to support its claim that Quantum had failed to comply with applicable state statutes, rules, or regulations by engaging in the Corporate Practice of Medicine, which it alleged was prohibited by the Texas Occupations Code and the Texas Administrative Code. *See, e.g.*, Tex. Occ. Code §§ 155.001 ("A person may not practice medicine in this state unless the person holds a license issued under this subtitle."); .003 (setting forth eligibility requirements for obtaining license to practice medicine, including education and examination requirements); 22 Tex. Admin. Code § 177.17 (Tex. Med. Bd., Exceptions to Corp. Prac. of Med. Doctrine) ("The corporate practice of medicine doctrine is a legal doctrine, which generally

prohibits corporations, entities or non-physicians from practicing medicine. The prohibition on the corporate practice of medicine is based on numerous provisions of the Medical Practice Act."). On appeal, Quantum argues that any acts constituting the corporate practice of medicine could not give rise to a breach of contract claim because Section 24 does not contain the term "corporate practice of medicine" nor does it "directly [or] indirectly allude to any statute that relates to the corporate practice of medicine." Quantum maintains that, to give rise to a breach of contract claim based on failure to comply with statutes, rules, or regulations, the contract must identify the particular rule, regulation, or statute that must be complied with. According to Quantum, because Section 24 does not expressly include language stating that its engaging in the corporate practice of medicine would constitute a breach of the Agreement, no breach of contract claim could be predicated on Quantum's having done so. Put differently, Quantum argues that because Section 24 does not state that Quantum is obligated to comply with the prohibition on the corporate practice of medicine, its failure to comply cannot constitute a breach of contract. To support this assertion, Quantum points to *Johnson v. World Allied Financial Corporation*, 830 F.3d 192 (5th Cir. 2016), and *Smith v. JPMorgan Chase Bank, N.A.*, 519 F. App'x 861 (5th Cir. 2013). Quantum states that these cases stand for the proposition that "regulations do not permit a private cause of action unless the regulations are expressly incorporated into" the contract. *See Johnson*, 830 F.3d at 196 ("HUD regulations do not give the borrower a private cause of action unless the regulations are expressly incorporated into the lender-borrower agreement."); *Smith*, 519 F. App'x at 864 (holding that "[f]ederal statutes and regulations can form the basis of a breach-of-contract claim if the parties expressly incorporate them into their contact"). Quantum urges this Court to conclude that a breach of contract based on failure to comply with a statute, rule, or regulation is only available if the contract identifies or refers to the particular statute that the defendant failed to comply with.

8

Unlike the present case, neither *Johnson* nor *Smith* involve contracts in which the parties had agreed to comply with "applicable federal, state and local statutes" as did the parties here. In *Johnson*, plaintiff sued defendant alleging that foreclosure on her property by a third party resulted from defendant's failure to comply with guidelines established by the United States Department of Housing and Urban Development (HUD) when issuing her a reverse mortgage agreement. Plaintiff asserted that defendant's failure to comply with HUD guidelines constituted a breach of the reverse mortgage agreement. The court noted that HUD regulations govern the relationship between the reverse-mortgage lender (defendant here) and HUD as insurer of the loan and that, unless the lender-borrower agreement expressly included a provision requiring defendant to comply with HUD guidelines, no private cause of action would arise for the lender's failure to do so. *Johnson*, 830 F.3d at 196. In the present case, by contrast, the Services Agreement contains a provision, Section 24, expressly providing that Quantum agreed to comply with "applicable federal, state and local statutes, rules and regulations." These include the prohibition on the corporate practice of medicine. *See* Tex. Occ. Code §§ 155.001, .003; 22 Tex. Admin. Code § 177.17.

In *Smith*, plaintiff borrowers, after defaulting on their mortgage, sued defendant lenders for breach of contract, alleging that they breached the deed of trust securing their note by "failing to respond to their qualified written request under RESPA."[3] 519 Fed. App'x at 864. The court noted that "federal statutes and regulations can form the basis of a breach-of-contract claim if the parties expressly incorporate them into their contract." *Id.* The court stated that the only

---

[3] RESPA refers to the Real Estate Settlement Procedures Act, a federal law that protects homebuyers and sellers from predatory lending practices and abusive real estate settlement practices. *See* 12 U.S.C. §§ 2601-2617.

provision in the deed of trust that referenced federal law did so in a choice-of-law provision and there was nothing else in the deed reflecting the parties' agreement to comply with RESPA or any other federal statute or regulation. *Id.* The court held that in the absence of any incorporation of federal laws generally or specifically, the plaintiff borrowers could not base a claim for breach of contract on RESPA. *Id.* Again, in the present case the parties expressly agreed in Section 24 to "comply in all respects" with "applicable federal, state and local statutes, rules and regulations," which include the prohibition on the corporate practice of medicine. *See* Tex. Occ. Code §§ 155.001, .003; 22 Tex. Admin. Code § 177.17.

We conclude that Quantum could be found liable for breach of contract by failing to comply with the prohibition on the corporate practice of medicine even though the contract did not specifically reference that prohibition or the specific statutes upon which the prohibition is based. Our determination is consistent with cases from other Texas courts affirming breach of contract claims based on failure to abide by an agreement to comply with applicable laws and regulations when the defendant failed to comply with a specific, but not expressly identified, law or regulation. *See, e.g.*, *Hancock v. Chicago Title Ins.*, 2013 WL 139547, at *5-6 (N.D. Tex. 2013) (affirming breach of contract claim where contract required defendant to "comply with all applicable regulations relating to the conduct of its business" and defendant failed to discount plaintiff's title insurance premium as required by Rate Rule R-8 of the Texas Basic Manual of Title Insurance); *Bernard v. L.S.S. Corp.*, 532 S.W.2d 409, 411 (Tex. App.—Austin 1976, writ ref'd n.r.e.) (affirming breach of contract claim where contract required defendant to "comply with all Federal, State, Municipal, and other laws, ordinances, rules, and regulations applicable" and defendant failed to pay state admission taxes).

10

Quantum also argues on appeal that Section 24 cannot be read to support a breach of contract claim based on non-compliance with applicable laws. Rather, Quantum asserts, Section 24 simply provides that, in the event a term or condition of the Agreement or application thereof violates or potentially violates any laws or regulations, the parties agree to "negotiate in good faith to amend or modify [the] Agreement so that it complies with such laws and regulations." According to Quantum, nothing in Section 24 permits a breach of contract claim for any non-compliance with the prohibition on the corporate practice of medicine. But Quantum's argument ignores the first sentence of Section 24, which plainly states that "the parties *agree to comply* in all respects with applicable federal, state and local statutes, rules and regulations." When interpreting a contract, we must consider the entire writing in an effort to give effect to all provisions. *In re Service Corp. Int'l*, 355 S.W.3d 655, 661 (Tex. 2011) (orig. proceeding). The second sentence of Section 24 addresses the parties' obligations in the event the party or its counsel is of the opinion that a *term of the contract* or *its application to* any person or event "shall [] violate or potentially violate any laws." In that event, the parties agreed to negotiate in good faith to amend or modify the Agreement. The first sentence, however, contains an agreement by each of the parties to comply with applicable federal, state and local statutes, rules and regulations. Failure to abide by that agreement constitutes breach of the Agreement, giving rise to a breach of contract claim. In this case, the jury found that Quantum failed to comply with statutes and rules prohibiting the corporate practice of medicine and, therefore, breached Section 24 of the Agreement.

Quantum also challenges the trial court's rendition of judgment on the jury's finding that HIA breached the contract on the ground that HIA has failed to establish that any breach by Quantum caused HIA to suffer the lost profits it sought, and the jury awarded, as compensatory damages. Quantum's argument is twofold. First, Quantum maintains that there was no causal

11

connection between Quantum's breach of the Agreement and the damages HIA sought to recover because HIA terminated the contract and, consequently, its own actions, not Quantum's breach, caused the loss of profits. Second, Quantum asserts that HIA failed to establish the existence of any lost profits with the reasonable certainty required to render them recoverable. We address each argument in turn.

After HIA determined that Quantum had breached the Agreement by failing to comply with all applicable statutes and regulations—specifically by engaging in the prohibited corporate practice of medicine—HIA terminated the Agreement and sued to recover the profits it claimed it would have earned had the contract continued. *See Mustang Pipeline v. Driver Pipeline Co.*, 134 S.W.3d 195, 196 (Tex. 2004) (plaintiff's performance under contract is excused in event of defendant's material breach); *see also Long Trs. v. Griffin*, 222 S.W.3d 412, 415 (Tex. 2006) (in event of defendant's material breach of contract, plaintiff may cease performance and sue for breach of contract). Relying on *Employee Retirement System of Texas v. Putnam, LLC*, 294 S.W.3d 309 (Tex. App.—Austin 2009, no pet.), Quantum argues that HIA's termination of the contract prevented it from recovering any compensatory damages. In *Putnam*, the Employee Retirement System of Texas (ERS) terminated a contract with Putnam whereby Putnam was to provide it investment advice for a portion of its retirement assets. *Putnam*, 294 S.W.3d at 312. When Putnam failed to maintain compliance with all regulatory agencies, as it had contractually agreed to do, ERS terminated the contract and transitioned management of the retirement assets to a different investment firm. ERS then sued Putnam, seeking damages in the form of transition costs it alleged it incurred when it moved management of its assets from Putnam to the new investment firm. Specifically, ERS sought to recover $8.6 million in commissions and taxes incurred in selling the Putnam-advised securities, commissions and taxes incurred in purchasing new securities pursuant

12

to the new investment firm's recommendations, and certain costs related to both the sale and purchase of securities during the transition period. *Id.* at 318. This Court held that the transition-cost damages were not available to ERS because they "would have been incurred even in the absence of a breach" since "ERS could not have reasonably anticipated that its advisory relationship with [Putnam] would last forever" and "[t]ransition costs for the Putnam-advised funds would have to be incurred at some point in the future." *Id.* at 319. The Court noted that ERS conceded that these costs represented the "general cost of doing business in any investment advisor/advisee relationship." *Id.* For these reasons, this Court concluded that the transitions costs did not "represent a pecuniary loss resulting from [Putnam's] alleged breach." *Id.* In essence, *Putnam* stands for the proposition that a party cannot recover as compensatory damages for breach of contract costs that it would have incurred in the absence of a breach. *Id.* (citing *Greer v. Varnell*, 65 S.W. 196 (Tex. App.—1901, no writ) for proposition that costs that would have been incurred even in absence of breach are not available as compensatory damages for breach of contract). In the present case, HIA sought damages in the form of *lost profits* that it would have earned if the contract had continued for the remainder of the contractual period, not *costs* it would have incurred at the conclusion of the contract regardless of whether the contract was terminated due to breach or ended by its own terms. This distinguishes the present case from *Putnam*. Here, there is a causal link between Quantum's breach of the contract as found by the jury and profits HIA lost when it ceased performance under the contract as a result of that breach.[4]

---

[4] Although Quantum insists that HIA terminated the Agreement pursuant to a without-cause provision, HIA's notice of termination references Quantum's breach of the non-solicitation provisions of the Agreement, and the jury found that Quantum breached the contract by failing to comply with both Section 8 (non-solicitation) and Section 24 (compliance with laws) and that HIA's lost profits resulted from that breach.

13

Quantum next argues that HIA did not establish its lost profits with the required degree of certainty. *See Signature Industrial Servs., LLC v. International Paper Co.*, 638 S.W.3d 179, 193 (Tex. 2022) (plaintiff must prove lost profits with reasonable certainty). Quantum invites this Court to adopt a legal conclusion that it maintains "other courts across the country" have reached; namely, that "a party may not recover lost profits based on a terminable-at-will contract beyond the amount of required notice, if any, for a party to terminate the contract." Quantum directs this Court to the dissenting opinion in *Pura-Flo Corp. v. Clanton*, 609 S.W.3d 320, 331 (Tex. App.—Houston [14th Dist.] 2020) (Frost, C.J., dissenting), *rev'd on other grounds*, 635 S.W.3d 637 (Tex. 2021). In *Pura-Flo*, the majority of the court affirmed a jury verdict awarding plaintiff, Donald Clanton, $19,500 as damages for Pura-Flo's failure to comply with its payment obligation under a water cooler rental agreement. 609 S.W.3d at 322. The jury found that the water cooler rental agreement had not been terminated by either party and that, in addition to past damages, Clanton was entitled to future damages of $50,000. *Id.* at 325. Pura-Flo argued on appeal that, because either party could terminate the contract at any time after trial and thereby "stop any further income," it was not reasonable for the jury to find that Clanton would sustain future damages. *Id.* at 325-26. The court of appeals held that "the agreement was not terminated and Clanton was entitled to seek reasonably certain future losses to place him in the economic position he would have enjoyed" had the agreement been performed. *Id.* at 328. In her dissenting opinion, Chief Justice Frost noted: "presuming that, as the jury found, no party had terminated the contract at the time of trial, Clanton did not address whether a reasonable probability existed that Pura-Flo would not terminate the contract and thus the contract would continue into the future for any period of time." *Id.* at 331 (Frost, C.J., dissenting). Chief Justice Frost reasoned that because there was no evidence that there was a reasonable probability that the agreement would continue,

there was legally insufficient evidence to support an award of future damages. *Id.* Chief Justice

Frost then observed:

> Though Texas courts do not appear to have addressed the issue yet, courts across the country have concluded that a party may not recover future lost profits based on a terminable-at-will contract beyond the amount of required notice, if any, for a party to terminate the contract. This reasoning makes sense because there can be no reasonable certainty or reasonable probability of profit when the contract may be terminated at the option of another contracting party. Because a terminable-at-will contract holds no promise for tomorrow, future profits, by definition, are uncertain—and by no means reasonably certain.

*Id.* As an initial matter, the issue before the *Pura-Flo* court was the availability of *future* lost profits

based on a suit for breach of a payment obligation where neither party had terminated the

agreement. In that instance, the dissent argued that there was legally insufficient evidence that the

contract would continue and future damages accrue, especially given that Pura-Flo had argued

unsuccessfully at trial that it had terminated the agreement. *Id.* ("Pura-Flo maintained at trial that

it had terminated the contract."). The dissent argued that there was no evidence that the agreement

would continue without being terminated post-trial such that Clanton had a right to recover future

damages. In the present case, however, the jury found that Quantum breached the contract, there

was evidence that HIA *had* terminated the contract, and the jury awarded Quantum lost profits as

compensatory damages for that breach, not based on any finding that the contract would continue

entitling HIA to future, post-trial, damages.

With regard to the Chief Justice's more general position that lost profits are not, as

a matter of law, recoverable on a contract that is terminable at will beyond the required notice

period, if any, we are unaware of any of our sister courts that have adopted this rule. And, in the

absence of Texas Supreme Court precedent, we decline to adopt this legal principle. *See Petco*

*Animal Supplies, Inc. v. Schuster*, 144 S.W.3d 554, 565 (Tex. App.—Austin 2004, no pet.) ("As an

15

intermediate appellate court, we are not free to mold Texas law as we see fit but must instead follow the precedents of the Texas Supreme Court unless and until the highest court overrules them or the Texas legislature supersedes them by statute."). "We must, in short, follow the existing law rather than change it, and we have adhered to that basic limiting principle in a variety of contexts." *Anderson v. Archer*, 490 S.W.3d 175, 177 (Tex. App.—Austin 2016), *aff'd* 556 S.W.3d 228 (Tex. 2018). In its opinion in *Pura-Flo v. Clanton*, the Texas Supreme Court declined to decide "whether terminable-at-will contracts can support future-damages awards in some cases because, whether or not such cases may exist, this is not one of them." 635 S.W.3d at 640.[5] We decline Quantum's invitation to adopt a bright-line rule that prevents the recovery of lost profits if a contract is one that is terminable at will.

We overrule Quantum's issue challenging the trial court's rendition of judgment on the jury's finding that Quantum breached the Agreement and the jury's finding regarding the amount of damages that would compensate HIA for the breach.

***Objections to Jury Charge***

The trial court provided the jury with the following definitions in the charge:

"Texas Prohibition on the Corporate Practice of Medicine" refers to the State's statutes, rules and regulations prohibiting general business corporations from practicing medicine, or controlling or directing physicians' medical decisions in any way. Generally, physicians may enter into "independent contractor" arrangements

---

[5] The supreme court based its reversal of the future damages award on the ground that "no reasonable basis exists [in the record] for a juror to believe the contract would have continued after trial, and thus, no basis exists for reasonable certainty as to either the fact of or amount of future damages." *Pura-Flo Corp. v. Clanton*, 635 S.W.3d 637, 640 (Tex. 2021). The court stated that "Pura-Flo's numerous attempts and unmistakable attempt to terminate the contract were sufficient to ensure that no reasonable juror could have concluded Pura-Flo would not terminate the contract as soon as possible" and that "no countervailing evidence demonstrated any reason Pura-Flo [] would have opted to continue the contact." *Id.*

16

with non-physicians.

> The reference to applicable State "statutes, rules and regulations" in Section 24 of the Services Agreement includes Texas' Prohibition on the Corporate Practice of Medicine.

In its second appellate issue, Quantum argues that (1) the definition of the "Prohibition on the Corporate Practice of Medicine" provided to the jury was legally incorrect and (2) the court's instruction that Section 24 included an agreement for Quantum to comply with Texas's Prohibition on the Corporate Practice of Medicine was legally incorrect.

When a party challenges the content of a trial court's definition in the jury charge as legally incorrect, our standard of review is de novo. *Transcontinental Ins. v. Crump*, 330 S.W.3d 211, 221 (Tex. 2010). Quantum first argues that the definition of the corporate practice of medicine given by the trial court is legally incorrect because it "suggests that the non-physician violates the corporate practice of medicine when it attempts (with or without success) to provide direction to a physician." Quantum asserts that the definition is, therefore, too broad and, therefore, legally incorrect because it would permit the jury to find Quantum in breach of Section 24 of the Agreement based on "even the most innocuous hospital administrative requirements." We understand Quantum to argue that the definition was legally incorrect because its overbreadth permitted the jury to find a breach of contract for conduct that did not legally constitute the corporate practice of medicine—such as directing physicians to arrive at work at a specific time—and therefore would not constitute a breach of Section 24's requirement that Quantum comply with rules and statutes prohibiting the corporate practice of medicine. Quantum ignores, however, that the definition of corporate practice of medicine given by the judge limits prohibited directions to physicians to those that "control[] or direct[] physician's *medical decisions* in any way." Thus, it is not directing the jury to find that Quantum's administrative directives

constituted the corporate practice of medicine but, rather, the charge limited the prohibited conduct to directives that would control or direct the physician's medical decisions.

Second, Quantum argues that the trial court's instruction was legally incorrect because it improperly instructed the jury that the Texas Prohibition on the Practice of Medicine was one of the statutes, rules and regulations that Quantum agreed to abide by in Section 24 of the Services Agreement. Specifically, Quantum asserted in its brief that the court compounded its error by "instructing the jury that Section 24 incorporated a legal definition of the Corporate Practice of Medicine when it did not." As an initial matter, the trial court's instruction was not that Section 24 "incorporated a legal definition" of the corporate practice of medicine but, rather, that the Texas Prohibition on the Corporate Practice of Medicine—as the term was defined in the jury instructions—was included in the "reference to applicable State 'statutes, rules and regulations' in Section 24 of the Services Agreement." As previously explained, Section 24 of the Services Agreement includes Quantum's agreement to comply with "applicable federal, state and local statutes, rules and regulations," which include the prohibition on the corporate practice of medicine. *See* Tex. Occ. Code §§ 155.001, .003; 22 Tex. Admin. Code § 177.17. We have already rejected Quantum's assertion that it was not required to comply with the prohibition on the corporate practice of medicine simply because Section 24 did not specifically identify it as an "applicable" statute, rule, or regulation.

Finally, to the extent Quantum also complains of the sufficiency of the trial court's definition of the Texas Prohibition on the Corporate Practice of Medicine, we cannot conclude that the definition constituted an abuse of the trial court's discretion. *See Kmart Corp. Store No. 7441 v. Trotti*, 677 S.W.2d 632, 636 (Tex. App.—Houston [1st Dist.]), writ ref'd n.r.e., 686 S.W.2d 593 (Tex. 1984) (trial court must explain to jury any legal or technical terms and in doing so is given

wide discretion to determine sufficiency of such explanations); *see also* Tex. R. Civ. P. 277 (trial court, in submitting case to jury, should issue such explanatory instructions and definitions as will enable jury as trier of fact to render verdict). A trial court abuses its discretion when it acts arbitrarily or unreasonably or without reference to any guiding rules and principles. *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002). As Quantum states, the source of the language in the definition was a website maintained by the Texas Medical Board, a state agency charged with enforcing the prohibition on the corporate practice of medicine. In its website, the Texas Medical Board defines the corporate practice of medicine as "a legal doctrine, which generally prohibits corporations, entities or individuals (i.e., non-physicians) from practicing medicine" and prohibits "physicians from entering into partnerships, employee relationships, fee splitting, or other situations with non-physicians where the physician's practice of medicine is in any way controlled or directed by [] a non-physician." *See https://www.tmb.state.tx.us/faq* (last visited Feb. 3, 2025). The trial court's definition of the Texas Prohibition on the Corporate Practice of Medicine in its charge is based on the definition provided by the Texas Medical Board and, therefore, is not without reference to any guiding rules or principles or otherwise arbitrary or unreasonable. Quantum argues that the Texas Medical Board definition of the Prohibition on the Corporate Practice of Medicine is focused on actions taken by the *physician* as opposed to the *non-physician* such that a definition that suggests that a *non-physician* may violate the prohibition is not consistent with the Texas Medical Board's definition. We disagree. The Texas Medical Board plainly describes the doctrine as a prohibition on "corporations, entities or individuals (i.e. non-physicians)" from practicing medicine. *Id.* And, as previously noted, the trial court's definition properly circumscribed acts falling within the prohibition to a corporation's "controlling or directing *physicians' medical decisions*" in any way. *See McCoy v. FemPartners, Inc.*, 484 S.W.3d

201, 205 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (discussing that violation of prohibition against non-physicians practicing medicine occurs when corporations employing licensed physicians to practice medicine are controlled by non-physicians); *see also Flynn Bros., Inc. v. First Med. Assocs.*, 715 S.W.2d 782, 785 (Tex. App.—Dallas 1986, writ ref'd n.r.e.) (discussing that corporation engages in unlawfully practicing medicine when it receives fees for medical treatment of patients by physicians).

### *Challenge to Award of Damages on HIA's Tort Claims*

The court submitted, and the jury answered, the questions relevant to HIA's claims that either Quantum and Lonestar tortiously interfered with covenants not to compete contained in (1) TAPN's employment contracts with seven nurse practitioners and (2) HIT's employment contracts with six physicians. The jury answered affirmatively that "either Defendant" intentionally interfered with covenants not to compete in TAPN's employment contracts with the seven nurses (Question 5) and found that the interference proximately caused $354,561 in damages (Question 6). The jury answered affirmatively that "either Defendant" intentionally interfered with covenants not to compete in HIT's employment contracts with the six doctors (Question 7) and found that the interference proximately caused $340,565 in damages (Question 8). The trial court also submitted, and the jury answered, the following questions:

> **Question 11**: Was either Defendant part of a conspiracy to interfere with the following Plaintiffs' existing business contracts that damaged Plaintiffs?
>
> To be part of a conspiracy, a Defendant and another person or persons must have had knowledge or agreed to, and intended a common objective or course of action that resulted in damages to Plaintiff. One or more persons involved in the conspiracy must have performed some act or acts to further the conspiracy.
>
> **Answer "Yes" or "No".**

a.      TAPN's employment contracts with the nurse practitioners

**ANSWER:**___yes___

b.      HIT's employment contracts with the physicians

**ANSWER:**___yes___

**Question 12**: What sum of money, if paid now in cash, would fairly and reasonably compensate the following Plaintiffs for damages, if any, proximately caused by the conspiracy of the Defendants.

In answering this or any question about damages, answer each question separately. Do not add any amount for interest on damages. Do not increase or reduce the amount in one answer because of your answer to any other question about damages. Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the court when it applies the law to your answers at the time of the judgment.

**Answer in dollars and cents.**

a.      TAPN's employment contracts with the nurse practitioners

**ANSWER:**___$700,000.00_____

b.      HIT's employment contracts with the physicians

**ANSWER:**___$1,200,000.00____

In its judgment, the trial court stated, in relevant part: "To avoid a potential double recovery, Plaintiffs only seek damages awarded by the jury in response to Questions [] 12(a) and 12(b)." The trial court rendered judgment that TAPN recover "damages for conspiracy in the amount of $700,000" jointly and severally from Quantum and Lonestar and that HIT recover "damages for conspiracy in the amount of $1,200,000" jointly and severally from Quantum and Lonestar.

On appeal, Quantum and Lonestar argue that the trial erred by rendering judgment in the amounts awarded by the jury in Question 12, which it claims improperly awarded damages for conspiracy. We agree. Civil conspiracy is not an independent tort; rather, it is a theory of vicarious liability by which a plaintiff may seek to hold a party liable for the commission of an

unlawful act committed by a co-conspirator. *See Agar Corp. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 142 (Tex. 2019) (holding that, under Texas law, civil conspiracy is vicarious liability theory that imparts joint-and-several liability to co-conspirator rather than being independent claim where defendants may be held liable for damages caused by conspiracy itself). Thus, civil conspiracy is a "derivative tort" that "survives or fails alongside" the underlying tort alleged. *Id.* Because of civil conspiracy's derivative status, such a claim does not provide an independent basis for liability; the plaintiff's damages result from the underlying tort, not the conspiracy itself. *See Backes v. Misko*, 486 S.W.3d 7, 27 (Tex. App.—Dallas 2015, pet. denied); *see also Hart v. Moore*, 952 S.W.2d 90, 98 (Tex. App.—Amarillo 1997, pet. denied) ("Damages are not presumed from the existence of a conspiracy because the gist of a civil conspiracy action is the damage resulting from commission of a wrong which injures another, not the conspiracy itself."). As a theory of liability, conspiracy "permits a remedy against co-conspirators" without which "there would be no ground for recovery against co-conspirators who did not commit the underlying unlawful act." *Agar*, 580 S.W.3d at 141. The damages to the plaintiff arise from "the underlying unlawful act, not the conspiracy itself." *Id.* at 142. Thus, a plaintiff is entitled to damages caused by the unlawful act, in this case, interference with covenants not to compete in employment contracts, and not damages found to arise from the conspiracy itself. *Id.* (explaining that the damages element of civil conspiracy "refers not to the entire conspiracy itself but to some tortious act committed by a co-conspirator pursuant to the conspiracy"). In this case, the jury found that the damages arising from either Quantum's or Lonestar's interference with TAPN's and HIT's employment contracts was $354,561 and $340,565 respectively. These amounts are the proper measure of damages for the tortious interference claims, not the different amounts ($700,000 and $1,200,000 respectively) that the jury found resulted from Quantum's and

Lonestar's conspiring to interfere with those contracts.[6] We conclude that the trial court erred by permitting HIA to elect to recover the damages the jury awarded "for conspiracy" rather than for the underlying tort. The proper measure of damages for the tortious interference claims is the jury's award of $354,561 to TAPN and $340,565 to HIT.

### Attorneys' Fees for Breach of Contract Claims

The trial court submitted two breach of contract questions to the jury. First, the charge asked if Quantum breached the Services Agreement by failing to comply with Section 24 (failing to comply with statutes and laws). The jury answered affirmatively and awarded $4,517,623 as damages resulting from that breach.[7] Second, the charge asked if Quantum failed to comply with Section 8 (soliciting or hiring HIA contractors). The jury answered affirmatively and awarded $438,347 as damages resulting from that breach.[8] Having found that Quantum breached the Services Agreement, the jury awarded HIA a total of $1,729,759 as reasonable and necessary attorneys' fees for pursuing its breach of contract claims, divided evenly between the two claims. The jury awarded $864,879.50 as reasonable and necessary attorneys' fees for representation through trial on HIA's claim that Quantum breached Section 24 of the Service

---

[6] Although not supporting an award of damages independent of those awarded for the underlying tortious interference with contract claim, the jury's affirmative finding that "either Defendant" was part of a conspiracy explains the trial court's determination that Quantum and Lonestar are jointly and severally liable to TAPN and HIT for the damages caused by the tortious interference.

[7] HIA's expert testified that this was the total amount of HIA's lost profits resulting from termination of the Services Agreement eight months prematurely.

[8] HIA's expert testified that this was the portion of the total lost profits calculation that was attributable to the seven nurse practitioners that Quantum solicited from HIA's employment in breach of Section 8 of the Services Agreement.

23

Agreement and $864,879.50 as reasonable and necessary attorneys' fees for representation through trial on HIA's claim that Quantum breached Section 8 of the Services Agreement. The jury also awarded contingent appellate attorneys' fees for each breach of contract claim.

In its motion for judgment on the jury's verdict, HIA requested that the court render judgment in the amount of $4,517,623 on its breach of contract claims. HIA explained that it was not requesting judgment on the $438,437 awarded on its Section 8 breach of contract claim as well because those lost profit damages, which were related to the seven nurse practitioners, "are imputed or already included in the damages awarded for breach of Section 24." That is, because the jury awarded the full $4.5 million in total lost profits for the eight months remaining on the Services Agreement as damages for the Section 24 breach, HIA did not seek to recover a second time a component of the total lost profits—the $438,347 in lost profits attributable to the nurse practitioners for that same eight-month period. *See Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 7 (Tex. 1991) (explaining that one-satisfaction rule is "the longstanding proposition that a plaintiff should not be compensated twice for the same injury"); *First Title Co. v. Garrett*, 860 S.W.2d 74, 78 (Tex. 1993) (plaintiff should not recover windfall by recovering amount greater than trier of fact has determined would fully compensate for injury). Here, because the partial lost profits awarded as damages for the Section 8 breach were subsumed in the total lost profits awarded as damages for the Section 24 breach, HIA did not request that the trial court render a judgment awarding it both. HIA also requested that the trial court award it attorneys' fees of $1,729,759, which the jury had found to be the reasonable and necessary fees for representation through trial on HIA's two breach of contract claims.

In its final judgment, the trial court awarded HIA $4,517,623 as damages for breach of contract and a total of $1,729,759 in attorneys' fees, divided evenly between the breach of

24

contract claim based on Section 24 of the Services Agreement and the breach of contract claim based on Section 8 of the Services Agreement. On appeal, Quantum challenges the award of attorneys' fees, arguing that this Court should render judgment that HIA is not entitled to any fees for its breach of contract claim based on Section 8 of the Services Agreement or, alternatively, remand the case to the trial court for a new trial on attorneys' fees based on its assertion that HIA failed to segregate its fees incurred pursuing claims for which attorneys' fees are recoverable (i.e., its breach of contract claims) from those incurred in pursuing claims for which attorneys' fees are not recoverable (i.e., its tort claim).[9]

Quantum first argues that, as a matter of law, HIA is not entitled to the $864,879.50 the jury awarded as reasonable and necessary fees for its Section 8 breach of contract claim because, according to Quantum, HIA did not "prevail" on that claim. Relying on *Intercontinental Group Partnership v. KB Home Lone Star L.P.*, 295 S.W.3d 650, 653-54 (Tex. 2009), Quantum maintains that, to prevail on a breach of contract claim, a party must have been awarded some damages for its breach of contract claim. *See* 295 S.W.3d at 651 (to "prevail," plaintiff "must prove compensable injury and secure an enforceable judgment in the form of damages or equitable relief"). In *KB Home Lone Star*, the jury found that defendant breached a contract with plaintiff but answered "0" on damages. *Id* at 652. The supreme court noted that the jury had awarded plaintiff zero damages on its breach of contract claim and observed that because the "stand-alone finding on breach confer[red] no benefit whatsoever," the plaintiff was "leav[ing] the courthouse empty handed." *Id*. at 654; *see also id.* at 655 n.26. ("It is difficult to conclude a breach-of-contract

---

[9] Quantum also argues that, in the event this Court agrees that the trial court should have set aside the jury's finding that Quantum breached Section 24 of the Services Agreement, a remand for new trial on attorneys' fees is required. Because we have not done so, we need not address this argument. *See* Tex. R. App. P. 47.1.

25

plaintiff has prevailed when the jury says the plaintiff was wholly uninjured and denies all requested relief.") In the present case, however, the jury did not find that HIA was "wholly uninjured" by Quantum's breach of Section 8 of the Services Agreement. To the contrary, it awarded HIA $438,347 in damages for that breach. HIA elected to recover those damages only once—as part of the total lost profits awarded to it on its Section 24 breach of contract claim. But HIA's abiding by the one-satisfaction rule does not mean that the jury did not award HIA any damages or that it found HIA "wholly uninjured" by Quantum's breach of Section 8. Nor did HIA leave the courthouse empty-handed but, rather, with a judgment against Quantum in excess of $4 million.[10] We reject Quantum's assertion that HIA was not, as a matter of law, entitled to an award of attorney's fees on its claim that Quantum breached Section 8 of the Services Agreement.

Quantum also argues that the fee award must be reversed because HIA failed to segregate attorneys' fees related to work done on claims for which fees are recoverable from those related to work done on claims for which fees are not recoverable. Lorinda Holloway, HIA's expert witness on attorneys' fees testified, however, that all the attorneys' fees for which HIA sought recovery were for work done to advance the prosecution or defense of the breach of contract claims. Holloway stated that, although HIA also brought a claim for tortious interference with

---

[10] That HIA secured a judgment against Quantum in excess of $4 million on its breach of contract claims also distinguishes this case from another relied on by Quantum. *See Ellness Swenson Graham Architects, Inc. v. RLJ II-C Austin Air, LP*, 520 S.W.3d 145 (Tex. App.—Austin 2017, pet. denied). In that case, plaintiff, after the trial court's application of settlement credits from settling co-defendants, did not recover any damages from defendant. *Id.* at 169. This Court held that, because the final judgment did not award plaintiff any actual damages, plaintiff obtained no "'enforceable judgment' against [defendant] for damages that 'modified[d] [defendant's] behavior for [plaintiff's] benefit by forcing [defendant] to pay an amount of money [it] would otherwise not pay.'" *Id.* at 170. Here, the final judgment awards HIA significant actual damages and forces Quantum to pay an amount of money it would otherwise not pay, materially altering the parties' legal relationship. *See id.* at 170 (requiring that claimant obtain actual and meaningful relief from defendant to be "prevailing party").

contract, for which attorneys' fees are not recoverable, HIA did not seek to recover attorneys' fees for work specific to that claim alone. Holloway explained that, because one of the breach of contract theories—breach of Section 8—was based on Quantum's prohibited solicitation of HIA contractors and employees, it was based on the same conduct forming the basis for the tortious interference with contract claim and, consequently, the legal services related to that conduct furthered the prosecution of both a recoverable and an unrecoverable claim such that segregation of fees was not required. *See Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 313-14 (Tex. 2006) (holding that when discrete legal services "advance both a recoverable and unrecoverable claim" they are "so intertwined that they need not be segregated"). As Holloway testified, the breach of contract claim based on violation of the non-solicitation provision in Section 8 of the Services Agreement and the claim of tortious interference with the non-compete provisions in the contracts with the nurse practitioners and physicians arose out of the same transactions and were "dependent on the same set of facts or circumstances and thus are 'intertwined to the point of being inseparable.'" *Stewart Title*, 822 S.W.2d at 11-12 (citation omitted). The two claims are so interrelated that "prosecution *or defense* entail[ed] proof or denial of essentially the same facts." *Id.* Holloway's testimony regarding legal work done to defend against Quantum's motion for summary judgment on the tortious interference with contract claim proves the point:[11] discrete legal services rendered defending against a summary judgment motion asserting that, as a matter of law, Quantum did not interfere with the nurse practitioner and physician contracts would necessarily advance the breach of contract claim by removing a legal defense to it—i.e., that

---

[11] When discussing why some work related to the tortious interference claim was recoverable, Holloway explained: "But remember, the way you respond to a dispositive motion is to demonstrate to the Court the facts and the evidence that show that, no, there's a jury question here and that's these facts, they are inextricably intertwined."

Quantum did not commit the acts that HIA alleged constituted both a breach of the Services Agreement and tortious interference with the nurse practitioner and physician contracts. In essence, the two claims rose and fell together. *See Tony Gullo Motors*, 212 S.W.3d at 313-314 (holding that although intertwined facts alone do not make tort fees recoverable, when "discrete legal services advance both a recoverable and unrecoverable claim" they are sufficiently intertwined that fees need not be segregated). Because the legal services that would advance either the prosecution or defense of the breach of contract claim also advanced the prosecution or defense of the tortious interference claim, the legal services were so intertwined that HIA was not required to segregate them.

### *HIA's Cross-Appeal*

We now turn to HIA's cross-appeal in which it challenges the court's pre-trial summary judgment in Quantum's favor on HIA's breach of contract claim based on its assertion that Quantum failed to pay in full the amounts due under the Services Agreement for physician and advanced practice clinician (APC) charges prior to the date of termination of the Services Agreement. The Services Agreement contained the following provision regarding payment for physicians and APCs supplied at the five hospitals by HIA:

4.    Compensation to HIA.

4.1 In consideration for the services provided by HIA pursuant to this Agreement, [Quantum] shall pay to HIA, on a monthly basis, an amount equal to HIA's total costs incurred in providing Physicians and APCs to provide professional services on behalf of [Quantum] at Covered Hospitals pursuant to this Agreement. For purposes of this Agreement, HIA's "Total Costs Incurred" shall include, but not be limited to, all Physician and APC compensation in the amounts set forth in Exhibit "A" to this Agreement, and all other reasonable expenses, incurred for and directly related to the performance of the obligations as provided hereunder.

Exhibit A, titled "Physician and APC Compensation," sets out the parties' agreement regarding the compensation scheme for physician and APC time as follows:

Physician

a.      $115/Round Physician Day Hour (6:00 a.m. to 6:00 p.m.)

i.  Expect average staffing rate of 1.24-1.5 billed patient encounters per hour (15-18 patient encounters per 12 hour shift)

ii.    Compensation is based on scheduled hours.  Any variance from scheduled hours needs explanation.

iii.   $130/Physician Day hour for serving as combination Rounder + Admitter (12p-6p)

b.      $150/Physician In-House Night Hour (6:00 p.m. to 6:00 a.m.)

i.  Expected coverage ration per night []

ii.    Compensation is based on scheduled hours.  Any variance from scheduled hours needs explanation.

c.      $7/RVU[12]

d.      $55/NPP (Non Physician Provider (NP/PA)) Hour.  The productivity of said NPP will be counted at 60% of the productivity rate of the physician for calculating staffing purposes.

e.      The above payments amounts shall increase annually on the anniversary date of the Agreement, at the lower of five percent (5%) or the Consumer Price Index US City Average, Medical Care (CPI-U) (issued by the U.S. Department of Labor, Bureau of Labor Statistics).

Thus, the parties agreed to, and memorialized in Exhibit A, a detailed compensation scheme, including an annual rate escalator, for Quantum to pay HIA for the physicians and APCs HIA

---

[12]   RVU refers to "Relative Value Units" and "represents a measure of value for each medical procedure performed by a medical practitioner."

provided to staff the five hospitals pursuant to the Services Agreement. Exhibit A also provided

for the method by which HIA was to invoice Quantum for these services:

> HIA Payments will be provided as follows:
>
> a. HIA to invoice [Quantum] for hours worked with breakdown of day and night shifts as defined above along with copy of schedule.
>
> b. [Quantum] will pay HIA monthly for physician hours worked.
>
> c. [Quantum] will pay HIA monthly for RVU payment using RVUs that are total in TeamHealth's billing system by its professional coders (IDX).

HIA invoiced, and Quantum paid, the staffing compensation charges as outlined in Exhibit A. After

terminating the Services Agreement, however, HIA asserted that Quantum was required to pay an

additional $2,626,810 in staffing compensation charges described as:

> Reimbursement for Total Costs Incurred by HIA in fulfillment of our obligations to [Quantum] prior to June 2016. Please see below for the reasonable expenses which HIA has incurred that are in direct relationship to performance of our obligation for TeamHealth:

| Description | Amount |
| --- | --- |
| Recruiting-Commissions | $ 109,350 |
| Locums-D&Y | $2,272,534 |
| Contract Labor-1099s | $ 244,926 |
| Total Costs | $2,626,810 |

When Quantum refused to pay the additional staffing compensation, HIA sued Quantum to recover

the additional amounts billed, asserting that they constituted part of the "Total Costs Incurred" to

which they were entitled pursuant to section 4.1 of the Services Agreement.

Quantum moved for summary judgment on HIA's breach of contract claim, asserting that it had paid the invoices for physician and APC time in accordance with the compensation scheme contained in Exhibit A and, consequently, was not in breach of section 4.1 of the Services Agreement. HIA countered that the $2,626,810 represented costs it incurred in recruiting physicians, "locums,"[13] and contract physicians to staff the covered hospitals as it was obligated to do under the Services Agreement. According to HIA, the "Total Costs Incurred" to which it was entitled constituted not just physician and APC compensation at the rates set forth in Exhibit A, but also associated expenses it incurred in recruiting those physicians and APCs.[14] The trial court granted Quantum's motion for summary judgment on HIA's claim of breach of section 4.1. In its cross-appeal, HIA argues that the trial court erred by granting summary judgment and requests that this Court reverse the order and remand the cause for a determination of the amount Quantum owes HIA as "other reasonable expenses" under section 4.1 of the Services Agreement.

Whether summary judgment is proper is a question of law that we review de novo, viewing the evidence in the light most favorable to the non-movant and resolving all doubts in the non-movant's favor. *City of Keller v. Wilson*, 168 S.W.3d 802, 824 (Tex. 2005); *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). "Traditional" summary judgment is proper if (1) there is no genuine issue of material fact, and (2) the movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c). A defendant who conclusively negates at least one

---

[13] "Locum tenens" are a form of temporary contract healthcare provider, typically physicians who travel on short notice to provide services on a temporary basis, usually at a higher rate.

[14] On appeal, HIA appears to acknowledge that Quantum already paid $1,096,263 for the locums' professional services based on the rates set forth in Exhibit A and asserts that the "contingent/conservative" balance owed is $1,432,133, representing the difference between the hourly rate established in Exhibit A and what it paid the locums to staff the covered hospitals.

31

essential element of a plaintiff's cause of action is entitled to summary judgment on that claim. *IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2004).

As previously noted, section 4.1 of the Services Agreement provides that "HIA's 'Total Costs Incurred' shall include, but not be limited to, all Physician and APC compensation in the amounts set forth in <u>Exhibit 'A'</u> to this Agreement, and all other reasonable expenses, incurred for and directly related to the performance of the obligations as provided hereunder." HIA maintains that the term "Total Costs Incurred" unambiguously includes its costs of recruiting physicians and hiring "locums" on a temporary basis to staff the covered hospitals. Quantum counters that section 4.1 provides that Exhibit A includes all aspects of physician and APC compensation and caps that compensation at the rates provided therein and that the "other reasonable expenses" to which HIA is entitled refers only to expenses unrelated to supplying physicians and APCs to staff the hospitals. We agree with Quantum.

Our primary objective in this cross-appeal is to ascertain the true intent of the parties as expressed in the Services Agreement. *National Union Fire Ins. v. CBI Indus.*, 907 S.W.2d 517, 520 (Tex. 1995). If the terms used in the contract can be given a definite or certain legal meaning, the contract is unambiguous and will be enforced as written. *David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 451 (Tex. 2008); *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex. 1983). In construing the contract's language, we must apply the ordinary and generally accepted meaning of the words used unless the contract indicates that the language used is intended to impart a technical or different meaning. *American Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 158 (Tex. 2003). In addition, we must give effect to all provisions so that none are rendered meaningless. *Id.* at 157. "Surrounding circumstances may be considered—not to determine a party's subjective intent— but to determine the appropriate meaning to ascribe to the language chosen by the parties." *Moon*

*Royalty, LLC v. Boldrick Partners*, 244 S.W.3d 391, 394-95 (Tex. App.—Eastland 2007, no pet.); *see also National Union*, 907 S.W.2d at 521. An ambiguity does not arise simply because the parties offer conflicting interpretations of the contract language. *National Union*, 907 S.W.2d at 520.

Section 4.1 defines "Total Costs Incurred" to include two categories of costs: (1) "all Physician and APC compensation in the amounts set forth in Exhibit A" and (2) "other reasonable expenses." To be considered a recoverable "Total Cost Incurred," each category must be "incurred for and directly related to the performance of the obligations" in the Services Agreement. Thus, section 4.1 and Exhibit A memorialize the parties' agreement as to how HIA will be compensated for providing physicians and APCs to staff the covered hospitals; specifically, a flat hourly rate along with an annual rate escalator. In addition to the agreement to pay HIA its costs of supplying physicians and APCs at the rates set forth in Exhibit A, Quantum agreed to pay "other reasonable expenses" HIA incurred and directly related to performance of the Services Agreement. These other reasonable expenses, however, are necessarily "other" than those related to providing physicians and APCs to staff the covered hospitals because those costs are all set forth in Exhibit A. Accepting HIA's interpretation of section 4.1 as requiring Quantum to pay for any costs HIA itself incurred in procuring physicians and APCs to staff the covered hospitals essentially writes the agreed upon payment schedule set forth in Exhibit A out of the Services Agreement and would allow HIA to recover from Quantum dollar for dollar whatever it spent to provide the promised physician and APC staffing to the covered hospitals. We conclude that Exhibit A sets out the "total cost" that HIA could expect to recover for providing physicians and APCs to staff the hospitals. Just as Quantum could not demand to pay less if HIA was able to provide physicians and APCs to staff the hospitals at less than the hourly rates set forth in

33

Exhibit A, HIA could not demand that Quantum pay more than the hourly rates for physician and APC time set forth in Exhibit A. We conclude that the term "Total Costs Incurred" in section 4.1 unambiguously refers to the total physician and APC compensation for providing those professional services based on the rates set forth in Exhibit A to the Services Agreement. Additional recruiting costs or commissions associated with providing physicians and APCs to staff the covered hospitals do not constitute "Total Costs Incurred." The trial court did not err in granting Quantum's motion for summary judgment. We overrule the first issue raised in HIA's cross-appeal.[15]

**CONCLUSION**

For the reasons stated in this opinion, we reverse the portion of the trial court's judgment awarding TAPN damages of $700,000 for conspiracy to interfere with its contracts with seven nurse practitioners and render judgment that it recover the $354,561 in damages the jury found would fairly and reasonably compensate it for the interference with those contracts. The pre-and post-judgment interest awarded to TAPN by the trial court are to be calculated based on this damages award. We also reverse the portion of the trial court's judgment awarding HIT $1,200,000 for conspiracy to interfere with its contracts with six physicians and render judgment that it recover the $340,565 in damages the jury found would fairly and reasonably compensate it for the interference with those contracts. The pre- and post-judgment interest awarded to HIT are to be calculated based on this damages award. The remainder of the trial court's judgment is affirmed.

---

[15] Because of our disposition of this issue, we need not address HIA's second issue arguing that it did not waive its contractual rights under section 4.1. *See* Tex. R. App. P. 47.1

34

_____

Chari L. Kelly, Justice

Before Chief Justice Byrne, Justices Triana and Kelly

Affirmed in Part; Reversed and Rendered in Part

Filed:   February 7, 2025